The GOLDSBORO CITY BOARD OF EDUCATION, Appellant,

v.

The WAYNE COUNTY BOARD OF EDUCATION, Appellee.

No. 83–1735.

United States Court of Appeals,
Fourth Circuit.

Argued July 9, 1984.
Decided Oct. 5, 1984.

James C. Fuller, Jr., Charlotte, N.C. (Thorp, Fuller & Slifkin, P.A., Raleigh, N.C., J. LeVonne Chambers, Chambers, Ferguson, Watt, Wallas & Adkins, P.A., Charlotte, N.C., Lindsay C. Warren, Jr., Taylor, Warren, Kerr & Walker, Gordon C. Woodruff, Narron, O'Hale, Whittington, & Woodruff, P.A., Goldsboro, N.C., on brief), for appellant.

Alfred A. Lindseth, Atlanta, Ga. (Sutherland, Asbill & Brennan, Atlanta, Ga., George K. Freeman, Jr., H. Jack Edwards, Freeman & Edwards, Goldsboro, N.C., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

I

The plaintiff appeals from an order of the United States District Court for the Eastern District of North Carolina dismissing its cause of action which alleged constitutional violations by the defendant that had a segregative effect on the plaintiff's schools and its students.

On July 7, 1981, the Goldsboro City Board of Education (City Board) filed the present action against the Wayne County Board of Education (County Board). The City Board alleged that the County Board's refusal to merge the City and County school systems maintained a racially discriminatory structure of public education in both the City and County in violation of the Fourteenth Amendment and 42 U.S.C. §§ 1981–1983 and § 2000d. The plaintiff sought declaratory and injunctive relief, including an *interdistrict* remedy which would, in part, require consolidation of the city and county schools.

In December, 1982, the district court granted the defendant's motion to bifurcate the liability and relief segments of the trial. However, the district court denied the plaintiff's motion to join additional party defendants, including the Goldsboro Housing Authority and the Wayne County Board of Commissioners.

The district court, sitting without a jury, heard evidence for two weeks beginning on January 17, 1983. At the conclusion of the plaintiff's evidence, the district court directed a verdict in favor of the defendant.

The district court filed a memorandum of decision with its separate judgment on June 10, 1983. The district court found that there was no intentional racial discriminatory act or failure to act on the part of the defendant which caused racial segregation in the plaintiff's school district.

On July 27, 1983, after obtaining an extension of time to file, the plaintiff filed a notice of appeal. The plaintiff raises two arguments on appeal: 1) that the district court's findings of fact that the County Board acted in a nondiscriminatory manner are clearly erroneous; and, 2) that the district court did not apply the correct legal standard to the case.

II

The City of Goldsboro, North Carolina, is completely surrounded by Wayne County, North Carolina. In 1881, the North Carolina General Assembly established a school district coterminous with Goldsboro Township. Although the boundaries of Goldsboro have grown since 1881, the City school district boundaries have remained essentially the same since it was created. The County school district encompasses the rest of the City and the County.[1]

Prior to the 1960's, *de jure* segregation existed in both school districts. In 1973, the United States District Court for the Eastern District of North Carolina dismissed, by consent, a desegregation action

---

1. The Wayne County school district did merge with the Fremont City district in 1967. The Fremont district was also wholly within Wayne County. The majority of the Fremont students were black.

against the Goldsboro City Board upon a finding that the City Board was operating a unitary (*i.e.*, desegregated) school system. The United States Department of Health, Education and Welfare approved a desegregation plan for the Wayne County schools in 1970. The district court found, in the present case, that Wayne County has maintained a unitary school system since the early 1970s.[2]

For the school year 1965–1966, the Goldsboro City schools had an enrollment of just over 9,000 students of whom 46.3 percent were black. By 1981–1982 the enrollment had dropped to 5,000 students of whom 77.7 percent were black. For the 1965–1966 school year, the Wayne County schools had an enrollment of 13,832 students of whom 33.5 percent were black. By 1981–1982, the enrollment had dropped to 13,089 students of whom 31.3 percent were black.

Although the percentage of black students in the Goldsboro schools has increased since the mid-1960s, the district court found that the quality of education being offered in the school system has not suffered. Test scores have improved and Goldsboro offers a complete Latin curriculum which is offered at very few schools in North Carolina.

The City Board has been pursuing a merger of the Goldsboro school system with the Wayne County system since the late 1960s. Throughout the 1970s and in 1980, the County Board spurned the City Board's merger overtures. The plaintiff presented evidence to the district court that the County Board's spurning was motivated by the Goldsboro district's "problem," the large number of black students in its system.

Beginning in 1973, the City Board requested on several occasions that housing located on the Seymour Johnson Air Force Base be released by the County board and be made part of the City school district. The housing not only contained many white children, but whoever was educating the military dependents would receive a special federal subsidy. The County Board refused to release the air force housing area.

The district court found that the County Board's refusals to merge or change the district's boundaries were not based on racially discriminatory purpose or intent. The district court said:

the evidence shows unmistakably that the primary reasons why defendant has not agreed to change the boundary lines between the two administrative units or to merge the two units have been that in view of the fact that defendant was operating a unitary school system and offering equal educational opportunities to all its students no changes were necessary; that the changes requested by plaintiff would result in hardships to the Wayne County school system and its students; that there is strong resistance on the part of the parents of children attending the Wayne County schools to any changes which would result in their children being reassigned to schools outside of their immediate communities; and that there is no legal duty on the part of the defendant to accede to plaintiff's requests in order to assist the plaintiff in what it perceives to be a problem of racial imbalance within its own school system. The court finds these reasons to be logical, legitimate and non-discriminatory.

The plaintiff also alleged that the County Board had caused white flight from the City school system by establishing "white haven" schools. The district court found that the County Board was not maintaining racially identifiable schools. The district court also noted that the County Board built but one school during the period in question and it was built to replace a sixty year old school.

The plaintiff also claims that black population of the City schools was increased by

---

2. The district court's finding is supported by substantial evidence and, thus, unassailable on appeal.

the fact that public housing was built in the Goldsboro City district and the County Board of Commissioners cooperated with the County Board of Education in opposing certain public housing in the county. The district court found that the plaintiff failed to show that the defendant or any other government official or agency had ever opposed the location or construction of public housing within the County district.

The district court noted that the County schools' enrollment has remained constant over the years. The court speculated that the white flight from the City schools was not to County schools but to private schools. The court said the decrease in black students in the County schools during the same period was not accounted for by the evidence, "but a likely cause for this decrease may very well lie in the fact that as the farms in Wayne County, as in all sections of North Carolina, have become more mechanized there has been an increased migration off the farms by black families for whom farm work in prior years was the principal employment."

A. *The District Court's Factual Finding of an Absence of Discriminatory Intent is Supported by Substantial Evidence*

The plaintiff argues that the district court's finding of an absence of discriminatory intent on the part of the County Board is clearly erroneous and, thus, the district court should be reversed pursuant to Fed. R.Civ.P. 52(a).[3]

There is evidence in the record that the County Board's refusal to merge was motivated by discriminatory intent. However, there is also evidence in the record that its members were motivated by other factors. The plaintiff argues that the district court's finding need be given less weight than usual in the present appeal because

the great weight of the evidence is against the finding, the evidence on the County Board's lack of racial motivation comes from depositions, which can be evaluated independently by the court of appeals, and that the district court's factfinding was infected by an erroneous legal standard.

The Supreme Court has said that appellate courts should give great deference to the district court's findings in school desegregation cases. *See Columbus Board of Education v. Penick*, 443 U.S. 449, 457 n. 6, 468, 99 S.Ct. 2941, 2946 n. 6, 2952, 61 L.Ed.2d 666 (1979); *see also Rogers v. Lodge*, 458 U.S. 613, 622, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 102 (1982) (finding of voting rights violation). The Fourth Circuit has said:

> In a discrimination case such as this one, we must be particularly hesitant to overturn the conclusions and findings of the district court as they relate to the design, motive and intent with which individuals act.

*Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir.1982) (upheld finding of discriminatory intent with respect to town's withdrawal from a low-income housing authority).

There is evidence of discriminatory intent in the present case. But, there is also evidence to the contrary. The sifting of facts and divining the true state of affairs is very difficult to do in a case, such as the present one, where intent is at issue. The district judge took two weeks of testimony and was better able to separate the wheat from the chaff than we can do with only a cold record before us. The plaintiff can point to relevant evidence that its view is correct. However, we have reviewed the record and believe that there is sufficient substantial evidence to support the findings of the district court. Thus, the district

---

**3.** The appellant did not raise the argument in its initial brief. Instead, it raised the issue for the first time in its reply brief. A reply brief is supposed to be a response to the appellee's brief, not a pursuit of a wholly new tack.

The appellee rightly objected to the appellant's "sandbagging," which would cut off their right

of reply. Because of the importance of the case and the centrality of the issue to its resolution, we decided to consider the issue. However, we also granted the appellee leave to file a response to the appellant's reply brief.

court's findings must be affirmed. *See* Fed.R.Civ.P. 41(b), 52(a).

The appellant argues that we can more freely review the findings in the present case than we can under the usual, "clearly erroneous", standard because much of the evidence in the present case is on paper. The paper aspect of the trial consisted of the reading of one deposition and portions of four others and the introduction of less than fifty others. The parol aspect of the trial lasted two weeks; thirteen witnesses testified on essential facts of the case. Even if we can more freely review the evidence in "paper" cases, which we doubt,[4] the present case does not fall into the category.

The Fourth Circuit gives less deference to factfinding when the district judge's findings are infected by application of an erroneous legal standard. *See Miller v. Mercy Hospital, Inc.,* 720 F.2d 356, 361–62 (4th Cir.1983). The plaintiff claims that the district court's findings were infected by its belief that the County Board did not owe a *duty* to the City Board to decrease the proportion of blacks in the City schools.

■ The district court did not misconstrue the law. An independent school district which has not caused segregation in a neighboring independent district has no duty to rectify a racial imbalance in the other district.[5] *See Bell v. Board of Education of Akron Public Schools,* 683 F.2d 963, 968 (6th Cir.1982); *Board of Ed. of Ind. School Dist. No. 53 v. Board of Ed. of Ind. School Dist. No. 52,* 413 F.Supp. 342,

349 (W.D.Okla.1975), *aff'd,* 532 F.2d 730 (10th Cir.1976), *cert. denied,* 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976). Both the City and County were found to have unitary school systems. In *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–1284, 28 L.Ed.2d 554 (1971), the Court said:

At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in *Brown I.* The systems would then be "unitary" in the sense required by our decisions in *Green* and *Alexander.*

It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

---

4. In *Pullman-Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), the Court said that even though findings of an absence to discriminate in a Title VII case were largely based on documentary evidence, the district court's findings still had to be reviewed under a clearly erroneous standard.

5. The district court found that since 1881 the Goldsboro City school system has been autonomous and has been operated independently of the Wayne County school system. The finding is not challenged on appeal. However, we note that until 1977 the County Board, whose members were elected by City and County residents, appointed the members of the City Board. Judge John R. Brown, in a dissent, has argued that the fact that city residents voted for mem-

bers of a county school board robbed the ostensibly separate city and county school boards of their independence and immunity from merger absent the special requisites for an interdistrict remedy set forth in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). *See Taylor v. Ouachita Parish School Board,* 653 F.2d 136, 138 (Brown, J., dissenting from *Taylor v. Ouachita Parish School Board,* 648 F.2d 959 (5th Cir.1981)).

Given that the City and County School Boards are currently elected by the citizens residing in their respective jurisdictions and there is no evidence in the record that even suggests that the boards were not, in fact, independent prior to 1977, we accept the district court's finding.

*Swann* implies that once a school system is unitary it has no duty to go to extraordinary measures to compensate for demographic changes it did not cause or encourage.

### B. *The Plaintiff's Legal Theory is Not Supported by Law*

The central theory of the plaintiff's case is that it is a constitutional violation for a county school system to maintain a county-city school district division, which was racially neutral when adopted, in the face of demographic changes which have made the population of the city schools more black. The plaintiff places great reliance upon *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), to support its theory.

*Rogers*, however, was a case in which the trial court found that racial discrimination existed. The Supreme Court, relying largely on its doctrine that great deference should be given to the district court's findings in discrimination cases, affirmed the district court's order that the county be divided into single-member districts.

■ *Rogers* is irrelevant to the present case. The courts have long held that if a governmental actor maintains [6] a system that has a disproportionate impact and does so with discriminatory intent, there is a violation of the Equal Protection Clause. However, the district court here determined that discriminatory intent was not present. Without discriminatory intent there can be no violation of the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[7]

The present case is governed by the multitude of cases dealing with interdistrict remedies for racial segregation in schools.[8] The pre-eminent interdistrict case is *Millik-*

*en v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). The *Milliken* Court struck down a district court order which consolidated fifty-three suburban Detroit school districts with the Detroit school system to remedy racial discrimination in Detroit's dual school system. The district court was motivated by its conclusion that the only way to achieve a desirable racial balance within Detroit was to merge Detroit with whiter school districts. The Supreme Court said:

> Boundary lines may be bridged where there has been a constitutional violation calling for interdistrict relief, but the notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country.

418 U.S. at 741, 94 S.Ct. at 3125. The Court said that the Detroit student-plaintiffs had a right to attend a school in a unitary school system in their district. 418 U.S. at 746, 94 S.Ct. at 3128. The plaintiff in the present case, a school board, is operating a unitary school system in the City of Goldsboro. The Court said an interdistrict remedy was only appropriate where:

> there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.

418 U.S. at 745, 94 S.Ct. at 3127. Other than not moving to prevent developments which it has not occasioned, the County Board has done nothing to produce segregation in Goldsboro. The reasons Goldsboro's schools have become blacker are demographic and, probably, the fact that

---

**6.** "Maintaining" implies something more than simply allowing something to happen or continue without doing anything whatever to bring the resulting condition about.

**7.** Of course, intent can be inferred from action, or inaction, in the appropriate case. *See, e.g., Diaz v. San Jose Unified School District*, 733 F.2d 660, 674 (9th Cir.1984).

**8.** The present case was divided into two parts for trial—liability and remedy. Only the liability issue is presently before the court. The cases speak in terms of the proper remedy. However, the remedy cases shed light on the requisites for liability.

Goldsboro has desegregated its own schools. The County school system and the black/white ratio have remained fairly constant in size since 1965. Goldsboro's school system has decreased from 9,000 students in 1965 to 5,000 students today. Although some of the decrease may be due to movement to the County, such a large decrease unaccompanied by an increase in the County shows that the decrease of white students in Goldsboro is not due solely, or indeed, insofar as the record reveals, predominantly, to any action by the County Board. The apparent causes are primarily demography (*i.e.*, end of the baby boom and the nationwide exodus from cities to suburbs) and the flourishing of private academies for white students.[9]

The present case differs from those cases where the courts have found an interdistrict remedy to be appropriate. In *Newberg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky*, 510 F.2d 1358, 1359 (6th Cir.1974), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 812, 50 L.Ed.2d 792

(1977), the Sixth Circuit allowed an interdistrict remedy because school district lines had been ignored in the past for the purpose of aiding and implementing continued segregation. There was some disregard for the district line between the County and City presently before us prior to 1969. However, there has been strict regard for the line during the last decade and a half, the period during which the County supposedly caused the City's school population to become predominantly blacker. The Fifth Circuit has said:

> the fact that an interdistrict transfer program was formerly used in order to maintain racial segregation in districts operating dual school systems does not support an interdistrict remedial order unless it is established that these transfer programs have a substantial, direct and *current* segregative effect. In the absence of such a showing of current segregative effect, we understand *Newburg*,[10] *Evans*[11] and *Armour*[12] to indi-

---

9. The plaintiff makes the point that educational planners believe that districts of the size of Wayne County and Goldsboro should be merged. The point is irrelevant. The *Milliken* Court noted:

> The dissents also seem to attach importance to the metropolitan character of Detroit and neighboring school districts. But the constitutional principles applicable in school desegregation cases cannot vary in accordance with the size or population dispersal of the particular city, county, or school district as compared with neighboring areas.

418 U.S. at 747 n. 22, 94 S.Ct. at 3128 n. 22. *See also Bradley v. School Board of the City of Richmond, Virginia*, 462 F.2d 1058, 1066 (4th Cir.1972), *aff'd without opinion by an equally divided court*, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973), where the court rejected an interdistrict remedy and commented on demographic change in Richmond:

> We think that the root causes of the concentration of blacks in the inner cities of America are simply not known and that the district court could not realistically place on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond. We are convinced that what little action, if any, the counties may seem to have taken to keep blacks out is slight indeed compared to the myriad reasons, economic, political and social, for the concentration of blacks in Richmond and does not support the conclusion that it has been invidious state action which has resulted in the racial composition of the three school districts. Indeed

this record warrants no other conclusion than that the forces influencing demographic patterns in New York, Chicago, Detroit, Los Angeles, Atlanta and other metropolitan areas have operated in the same way in the Richmond metropolitan area to produce the same result. Typical of all of these cities is a growing black population in the central city and a growing white population in the surrounding suburban and rural areas. Whatever the basic causes, it has not been school assignments, and school assignments cannot reverse the trend. That there has been housing discrimination in all three units is deplorable, but a school case, like a vehicle, can carry only a limited amount of baggage. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 24, 91 S.Ct. 1267 at 1281, 28 L.Ed.2d 554.

The court's sentiments are as applicable to the small county seat that is the subject of the present case as they were to Richmond.

10. *Newberg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky*, 510 F.2d 1358 (6th Cir.1974), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 812, 50 L.Ed.2d 792 (1977).

11. *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del. 1975), *aff'd*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

12. *Armour v. Nix*, No. 16708 (N.D.Ga.1979), *aff'd*, 446 U.S. 930, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980).

cate that no interdistrict remedy is appropriately ordered upon the basis of earlier interdistrict transfer programs. *Lee v. Lee County Board of Education*, 639 F.2d 1243, 1260 (5th Cir.1981). We agree.

In *United States v. Missouri*, 388 F.Supp. 1058 (E.D.Mo.1975), *aff'd*, 515 F.2d 1365 (8th Cir.1975), *cert. denied sub. nom. Ferguson Reorganized School District v. United States*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975), the district court found that two white districts were responsible for the maintenance of a third district as a black district. The white districts were found to have opposed reorganization of the districts because of racial animus. The district court found that opposition to merger was not based on racial animus in the present case.[13]

In *United States v. Board of School Commissioners of Indianapolis*, 573 F.2d 400 (7th Cir.1978), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), the Seventh Circuit said that an interdistrict remedy may be appropriate where it was standard practice and law in Indiana to expand city school district boundaries when city boundaries were expanded and the legislature, for the first time, expanded a city without requiring the expansion of the city school district. Although the boundaries

of the Goldsboro City school district are not coterminous with the City's boundaries, it was not common practice in the state of North Carolina to expand the city district with the city's boundaries upon growth through annexation and there is no allegation, much less proof, that failure to expand the school district boundaries was racially motivated.[14]

In *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975) (three-judge court), *aff'd*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), the court required the parties to submit interdistrict plans for the desegregation of the schools of Wilmington, Delaware. The court found that *de jure* segregation was a cooperative venture involving both Wilmington and its suburbs. For instance, Wilmington had the only black high school in the area during the days of *de jure* segregation and blacks from suburban areas attended the Wilmington high school. No such interdependence between Wayne County and Goldsboro is established in the record. The court also noted that the State of Delaware subsidized bus service for children from Wilmington to attend private schools in the suburbs. No such state of affairs exists in the present case. And, the court also noted that the State of Delaware encouraged housing segregation.[15]

---

**13.** Although the district court found an absence of racially discriminatory intent on the part of the County Board, it is clear that race, in one sense, was a factor in its decision. The racial composition of the County and City schools was at the forefront of many discussions on merger and boundary changes; the County Board issued an information sheet on boundary change that was almost solely concerned with the racial effect of the change. The fact that race is a factor in a decision by a governmental actor does not *ipso facto* make the decision illegal or unconstitutional. For instance, the primary motivation for the plaintiff's proposing to merge with the defendant and suing the defendant when it spurned the plaintiff's advances was a desire to dilute the black majority within the plaintiff's school system. The proposal, dealing with facts as they were, was, in the sense employed by plaintiff, inevitably "racial." The defendant, however, could, without behaving improperly, likewise assess the effect an increase

in the percentage of blacks would have on its system.

**14.** *Cf. Bradley v. School Board of the City of Richmond, Virginia*, 462 F.2d 1058 (4th Cir. 1972), *aff'd without an opinion by an equally divided court*, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973) (rejected interdistrict remedy because, *inter alia*, school district boundaries were coterminous with other political boundaries).

**15.** The plaintiff in the present case does allege that the high proportion of black students in the City schools is due, in part, to the building of public housing within the City school district and the failure to build public housing in the County school district. The district court found that the location of public housing in Goldsboro and environs was directly related to the availability of public services such as water and sewer facilities which were not available in many parts of the county. There is no evidence

In *Little Rock School District v. Pulaski County Special School District No. 1,* 584 F.Supp. 328 (E.D.Ark.1984), the district court held that an interdistrict remedy was appropriate because, *inter alia,* county school districts failed to adhere to desegregation orders, constructed schools in locations which ensured they would be racially identifiable schools, and failed to assign blacks to administrative positions. The Wayne County schools are unitary and have been unitary since 1971. Only one school has been built in Wayne County since 1965, the school is one of the furthest from the city line.[16] And, blacks have been employed throughout the County system.

■ The post-*Milliken* cases indicate that a plaintiff must overcome a formidable hurdle to obtain interdistrict relief. The Fifth Circuit has recently analyzed *Milliken* and stated:

> We believe the Court's deliberate choice of phrases such as "substantial" or "di-

rect cause" and "significant segregative effect" also expresses an insistence that in cases where an interdistrict remedy is requested, there must be clear proof of cause and effect and a careful delineation of the extent of the effect. In the absence of such a showing, school district lines are to be carefully observed and desegregation remedies confined to orders affecting the school district in which the condition of segregation is manifest.

*Lee v. Lee County Board of Education,* 639 F.2d 1243, 1256 (5th Cir.1981); *accord Bronson v. Board of Education, supra,* 578 F.Supp. at 1099. The plaintiff in the present case has failed to show any discriminatory intent on the part of the defendant. Without discriminatory intent there is no constitutional violation, the prerequisite to a remedy. Even assuming, *arguendo,* that the defendant acted with discriminatory intent and consciously oper-

---

in the record that would support a finding that public housing was constructed in the City school district in order to concentrate black children in the City school system.

Assuming, arguendo, that the Goldsboro housing authority and the County Commissioners did place public housing in the Goldsboro City school district for a discriminatory purpose, it is still not clear that the action would justify an interdistrict school remedy. Justice Stewart's separate concurrence in *Milliken* and several lower courts have said that an interdistrict remedy is appropriate when any arm of the state has encouraged school district segregation by purposeful, racially discriminatory use of housing or zoning laws. *See Milliken v. Bradley,* 418 U.S. 717, 755, 94 S.Ct. 3112, 3132, 41 L.Ed.2d 1069 (1974) (Stewart, J., concurring); *United States v. Board of School Commissioners of Indianapolis,* 573 F.2d 400, 410 (7th Cir.1978), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978); *Evans v. Buchanan,* 393 F.Supp. 428, 438 (D.Del.1975) *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). However, other courts have held that school boards are not responsible for the decisions of other public agencies arrived at without encouragement or contrivance from the school boards. *See Bell v. Board of Education, Akron Public Schools,* 683 F.2d 963, 968 (6th Cir.1982); *Bronson v. Board of Education of the City School District of the City of Cincinnati,* 578 F.Supp. 1091, 1104 (S.D. Ohio 1984). Judge Craven's statement in *Bradley v. School Board,* 462 F.2d at 1066, indicates that we would follow the Sixth Circuit and say

that the school board is not responsible for the housing decisions made by other governmental actors ("That there has been housing discrimination ... is deplorable, but a school case, like a vehicle, can carry only a limited amount of baggage."). However, we need not and do not resolve the issue in the present case.

The *Evans* Court noted another ground for justifying an interdistrict remedy—Wilmington was excluded from a 1968 act of the Delaware legislature which allowed the State Board of Education to reorganize school systems without voter approval for one year. The court's finding of a wrong was based on the disproportionate impact of the act rather than the discriminatory intent of the legislature. The court's analysis does not withstand the requirements of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which was decided after *Evans.*

16. We note that portable classrooms were added to the arguably "white" (*i.e.,* 10.6% black in 1981 as opposed to 31.3% black for the county system as a whole) Rosewood schools during the 1970s. The fact could support a finding of intent to create a "white haven" for city residents. However, this fact alone is not strong enough to refute other evidence in the record such as the facts that since 1968 the sole assistant principal for the Rosewood schools has been black and the faculty of the Rosewood schools was over 20% black from 1969–1979, which support the district court's finding that the County Board did not intend to create any "white havens."

ated "white haven" schools, the plaintiff has failed to show that the defendant's actions directly or substantially caused the present, near-segregated state of its schools. Thus, the plaintiff has proven neither the presence of a constitutional violation nor the requisites for interdistrict relief.

### III

The plaintiff has a problem. Yet, its problem is one beyond our power, in the present state of the law, to correct. The plaintiff's problem is the result of movement from city to suburbs seen throughout the United States and the abandonment of public schools by white, city residents seen in many communities where desegregation has occurred. We are not at present charged with a responsibility to remedy problems caused by demography and private racism.

Accordingly, the district court's judgment is

AFFIRMED.