**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROY FISHER; JOSIE FISHER; MARIA
MENDOZA, EDWARD A. CONTRERAS,

*Plaintiffs-Appellants,*

v.

TUCSON UNIFIED SCHOOL DISTRICT,
*Defendant-Appellee,*

SIDNEY L. SUTTON; SALLY J.
SUTTON; JOHN R. CENTENO; MARY
KATHERINE CENTENO; LIBRADA G.
RUIZ; SIDNEY TAIZE,
*Defendant-intervenors-Appellees,*

v.

UNITED STATES OF AMERICA,
*Plaintiff-intervenor.*

No. 10-15124

D.C. Nos.
4:74-cv-00090-DCB
74-cv-00204-DCB

9771

ROY FISHER; JOSIE FISHER,
            *Plaintiffs-Appellants,*
            and
MARIA MENDOZA; EDWARD A.
CONTRERAS,
                        *Plaintiffs,*
UNITED STATES OF AMERICA,
            *Plaintiff-intervenor,*
            v.
TUCSON UNIFIED SCHOOL DISTRICT,
            *Defendant-Appellee,*
SIDNEY L. SUTTON; SALLY J.
SUTTON; JOHN R. CENTENO; MARY
KATHERINE CENTENO; LIBRADA G.
RUIZ; SIDNEY TAIZE,
    *Defendant-intervenors-Appellees.*

No. 10-15375

D.C. Nos.
4:74-cv-00090-DCB
74-cv-00204-DCB

ROY FISHER; JOSIE FISHER; MARIA
MENDOZA; EDWARD A. CONTRERAS,
        *Plaintiffs-Appellees,*

UNITED STATES OF AMERICA,
        *Plaintiff-intervenor-Appellee,*

                v.

TUCSON UNIFIED SCHOOL DISTRICT,
        *Defendant-Appellant,*

                and

SIDNEY L. SUTTON; SALLY J.
SUTTON; JOHN R. CENTENO; MARY
KATHERINE CENTENO; LIBRADA G.
RUIZ; SIDNEY TAIZE,
        *Defendant-intervenors.*

No. 10-15407

D.C. No.
4:74-cv-00090-DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
May 10, 2011—San Francisco, California

Filed July 19, 2011

Before: Betty B. Fletcher and Sidney R. Thomas,
Circuit Judges, and Nancy Gertner, District Judge.*

Opinion by Judge Thomas

---

*The Honorable Nancy Gertner, District Judge for the U.S. District
Court for Massachusetts, Boston, sitting by designation.

## COUNSEL

Rubin Salter, Jr., Tucson, Arizona, for the Fisher plaintiffs-appellants/cross appellees.

Cynthia Valenzuela Dixon, Mexican American Legal Defense and Educational Fund, Los Angeles, California, Lois D. Thompson, Jessica Freiheit Kurzban, and Jennifer Roche, Proskauer Rose, LLP, Los Angeles, California, for the Mendoza plaintiffs-appellants/cross appellees.

Thomas E. Perez, Assistant Attorney General, Dennis J. Dimsey and Holly A. Thomas, Civil Rights Division, Appellate Section, United States Department of Justice, Washington, DC, for plaintiff-intervenor the United States.

Richard M. Yetwin, Heather K. Gaines, and Sesaly O. Stamps, DeConcini McDonald Yetwin & Lacy, P.C., Tucson, Arizona, for defendant- appellee/cross appellant Tucson Unified School District.

## OPINION

THOMAS, Circuit Judge:

In 1974, African American and Mexican American students sued the Tucson, Arizona, school system, alleging intentional segregation and unconstitutional discrimination on the basis of race and national origin. For some 30 years after the parties settled in 1978, Tucson's schools operated subject to a federally enforced desegregation decree. In a careful review of the progress under the decree, the district court concluded that the school district had failed to act in good faith compliance with its desegregation obligations, but nonetheless declared the Tucson school system "unitary" and terminated court jurisdiction. Because Supreme Court precedent requires continuing

court supervision under these circumstances, we reverse and remand.

## I

In the wake of the *Brown* decisions,[1] federal courts fashioned and enforced desegregation decrees to ensure that school districts that once operated "state-compelled dual systems" performed their "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. Cnty. Sch. Bd. of New Kent Cnty., Va.*, 391 U.S. 430, 437-38 (1968) (citations omitted).[2] The test used to determine when unitary status has been achieved, and accordingly when federal court oversight may end, is well-established:

> The ultimate inquiry is " 'whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.' "

*Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) (alterations in the original) (quoting *Freeman v. Pitts*, 503 U.S. 467, 492 (1992) (quoting *Bd. of Ed. of Okla. City Public Schs. v. Dowell*, 498

---

[1] *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) (Brown I); *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955) (*Brown II*).

[2] *See Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 459 (1979) (" 'If school authorities fail in their affirmative obligations . . . , judicial authority may be invoked. . . . In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system.' " (second alteration in the original) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971))).

U.S. 237, 249-50 (1991))). The school district bears the burden of making these two showings. *Id.* at 88.[3]

The Supreme Court has underscored that the first showing, regarding good faith, is central to a district court's decision to declare a school system unitary and withdraw its supervision. In *Freeman*, the Court directed district courts to "give particular attention to the school system's record of compliance" because "[a] school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." 503 U.S. at 491. Indeed, "A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation." *Id.* at 498.[4] When a school district demon-

---

[3]Acknowledging that school desegregation class actions " 'present[ ] problems of considerable complexity,' " the Supreme Court has emphasized that responsibility for their resolution is shared. *Swann*, 402 U.S. at 12 (quoting *Brown I*, 347 U.S. at 495). " 'School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts [ ] have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.' " *Id.* (quoting *Brown II*, 349 U.S. at 299).

[4]The Supreme Court has emphasized that the lingering effects of *de jure* segregation, and not re-segregation caused by factors outside the school district's control, are the targets of properly tailored desegregation decrees:

> Once the racial imbalance [in student assignment] due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. . . . ["I]n the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary[.]"

*Freeman*, 503 U.S. at 494 (quoting *Swann*, 402 U.S. at 32); *see Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 941 (11th Cir. 2001) ("Put simply, a school board has no obligation to remedy racial imbalances caused by external factors, such as demographic shifts, which are not the result of segregation and are beyond the board's control." (citing *Jenkins*, 515 U.S. at 102; *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434 (1976); *Swann*, 402 U.S. at 22)).

strates good faith, it "enables the district court to accept [its] representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." *Id.* (citation omitted).

Just as important, the Court has stressed the breadth of the second showing, regarding whether the school district has eliminated the vestiges of past discrimination to the extent practicable. It has instructed district courts to "look not only at student assignments, but 'to every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities.' " *Dowell*, 498 U.S. at 250 (quoting *Green*, 391 U.S. at 435); *accord Jenkins*, 515 U.S. at 88. The Court has emphasized that desegregation decrees must "address *all these components* of elementary and secondary school systems." *Freeman*, 503 U.S. at 486 (emphasis added). Especially given that these so-called "*Green* factors may be related or interdependent" such that "a continuing violation in one area may need to be addressed by remedies in another," *id.* at 497, unitary status cannot be declared, and jurisdiction cannot be terminated, when a school district lags in one or more of them.

Guided by these principles, we turn to the case at bar. We review the district court's legal conclusions *de novo*. *DirecTV, Inc. v. Webb*, 545 F.3d 837, 842 (9th Cir. 2008). Cognizant that "[p]roper resolution of any desegregation case turns on a careful assessment of its facts," *Freeman*, 503 U.S. at 474, and aware of the deference owed district courts in such cases,[5]

---

[5]*See Penick*, 443 U.S. at 457 n.6; *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 296 (5th Cir. 2008) ("We have also recognized that, given the unique factual circumstances present in school desegregation cases, the district court's factual findings are entitled to 'great deference[,]' " particularly when "the district judge has 'supervised the case for many years.' " (quoting *Flax v. Potts*, 915 F.2d 155, 158 (5th Cir. 1990)); *N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch.*, 273 F.3d 960, 965 (11th Cir. 2001); *Dowell v. Bd. of Educ. of Okla. City Public Schs.*, 8 F.3d

we review the court's findings of fact—including its finding of unitary status—for clear error pursuant to Federal Rule of Civil Procedure Rule 52(a)(6). *Webb*, 545 F.3d at 842; *see Robinson v. Shelby Cnty. Bd. of Educ.*, 566 F.3d 642, 647 (6th Cir. 2009) (clear error standard for review of unitary status determination) (citing *Manning*, 244 F.3d at 940).[6] "The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.' " *Cohen v. U.S. Dist. Court for N. Dist. of Cal.*, 586 F.3d 703, 708 (9th Cir. 2009) (quoting *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993)).[7] However, "Rule 52(a) 'does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.' " *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984)).

---

1501, 1511 (10th Cir. 1993); *Goldsboro City Bd. of Educ. v. Wayne Cnty. Bd. of Educ.*, 745 F.2d 324, 327 (4th Cir. 1984) ("The Supreme Court has said that appellate courts should give great deference to the district court's findings in school desegregation cases.") (collecting cases); *Arthur v. Nyquist*, 712 F.2d 809, 813 (2d Cir. 1983); *Alexander v. Youngstown Bd. of Ed.*, 675 F.2d 787, 796 (6th Cir. 1982) (citing *Penick*, 443 U.S. at 469-71 (Stewart, J., concurring)); *Hoots v. Pennsylvania*, 639 F.2d 972, 979 (3d Cir. 1981) (citing *Evans v. Buchanan*, 555 F.2d 373, 380 (3d Cir. 1977) (en banc)).

[6]*Accord Anderson*, 517 F.3d at 296; *N.A.A.C.P., Jacksonville Branch*, 273 F.3d at 965; *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 317 (4th Cir. 2001) (en banc); *Coal. to Save Our Children v. State Bd. of Educ. of State of Del.*, 90 F.3d 752, 759 (3d Cir. 1996); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 666 (10th Cir. 1990).

[7]We are left with such a conviction when the district court's factual finding is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

II

A

The 1974 lawsuits filed by the Fisher and Mendoza plaintiffs, representing the district's African American and Mexican American students, respectively, were consolidated in 1975, and the United States was permitted to intervene as a plaintiff in 1976. The consolidated case went to trial in 1977, and in 1978 the district court found that the Tucson Unified School District[8] had acted with segregative intent in the past and had failed its obligation to rectify the effects of its past actions. *See Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1341 (9th Cir. 1980) (as amended) (describing the case's early procedural history and the district court's June 1978 order).[9] The court approved the District's proposed desegregation plans and a Settlement Agreement submitted by all parties. *See id.* at 1342-43.

The Settlement Agreement established and directed federal court oversight of the School District; it has been the desegregation decree at the center of this case for the past 30 years. In approving the Agreement, the district court described it as "designed to remedy existing effects of past discriminatory acts or policies." The Agreement itself professed to "finally resolve this litigation."[10] In the Agreement, the School District stipulated that it would implement its proposed desegregation

---

[8]Tucson maintained separate school districts for its primary and secondary students until 1977. We refer to the Tucson Unified School District as the "School District" or "the District" throughout.

[9]As the court below noted, this action therefore "falls squarely within the confines of a *de jure* case for purposes of determining whether or not [the School District] has attained unitary status." *See Penick*, 443 U.S. at 456-58.

[10]Furthermore, the Agreement provided that once it was implemented, "[T]he rights and obligations of the parties shall be determined solely by its terms and the terms of any subsequent stipulations or orders entered herein pursuant to it."

plans in a number of specified schools, cooperate with parents to develop and examine future student assignment policies at several additional schools, and eliminate discrimination in faculty assignments, employee training, and in policies on bilingual education, testing, and discipline. *Id.* at 1342. The Agreement required the District to file annual reports describing its schools' enrollments by race and ethnicity, detailing its faculty and staff assignments, and summarizing all programmatic changes made pursuant to the Agreement and assessing their effectiveness. Finally, the Agreement prohibited the District from engaging "in any acts or policies which deprive any student of equal protection of the law" based on race or ethnicity, and required court review of District acts or policies that "substantially affect the racial or ethnic balance in any school."

The Agreement provided that "[a]fter five full school years of operation under" its terms "and the student assignment plans adopted pursuant to" it, the District could "move the [c]ourt to dissolve" it and dismiss the actions, subject to objection by the plaintiffs or the United States as plaintiff-intervenor. It was more than 25 years, however, before the School District did so—and then only in response to the district court's 2004 sua sponte order directing the parties to show cause why the court should not declare the School District unitary and terminate its jurisdiction.[11]

B

In its Petition for Unitary Status, the District argued that it had shown its good faith commitment and eliminated the ves-

---

[11]The district court speculated that the School District's reticence, and the other parties' complacence, was owing to the fact that in 1983 "the state legislature enacted legislation which generated funding availability for districts incurring costs pursuant to court ordered desegregation. This opened the door for [the School District] to obtain millions of dollars in local tax revenue." *See* Ariz. Rev. Stat. § 15-910(G) (allowing appropriations for expenses incurred with respect to court desegregation orders).

tiges of discrimination to the extent practicable by measure of the *Green* factors. It claimed to have achieved unitary status and requested that the court dismiss the action and terminate its oversight of the District's operations.[12]

The Mendoza plaintiffs objected.[13] They challenged the District's contentions regarding both prongs of the unitary status inquiry and opposed the termination of federal jurisdiction. Both the School District and the Mendoza plaintiffs marshaled thousands of pages of evidence in support of their conflicting positions.

After reviewing the parties' arguments and extensive evidentiary submissions, on August 21, 2007, the district court stated its first of two preliminary findings that the School District had achieved unitary status. As to the first prong of the unitary status inquiry, the court concluded that it could not "make the requisite finding as to . . . [w]hether the provisions of the Settlement Agreement have been complied with in good faith." The court noted that "[g]ood faith means more than mere protestations of an intention to comply with the Constitution in the future," and instead requires evidence of "[s]pecific policies decisions, and courses of action." The court went on, however, to state that the School District could demonstrate its good faith by working with the other parties to develop so-called "post-unitary provisions"—"clearly stated" "goals . . . and requirements," "measurements of success and effectiveness," and "periodic review and reporting to the community regarding implementation, operation, and progress." The court indicated that the adoption of a plan consisting of "transparen[t] . . . post-unitary provisions" that allowed

___

[12]The School District specified, however, that it was not seeking the termination of federal court *jurisdiction*, so as not to jeopardize the funding it received pursuant to Ariz. Rev. Stat. § 15-910(G).

[13]The Fisher plaintiffs did not file a formal opposition to the District's Petition but in later proceedings objected to the District being declared unitary.

for public monitoring would "establish [the District's] good faith commitment to the future operation of the school system in compliance with the constitutional principles that were the predicate for this Court's intervention in this case."

As to the second prong of the unitary status inquiry, the court similarly concluded that it could not "make the requisite finding as to . . . [w]hether the vestiges of *de jure* segregation have been eliminated to the extent practicable." However, it stated that it "anticipate[d] that once compiled in a comprehensive report, the record will support a finding that the vestiges of *de jure* segregation have been eliminated to the extent practicable for student assignments." The court then ordered the District to compile such a report.

Overall, the court concluded that the parties' submissions to date were such that it was "hard pressed without spending hours upon hours of rutting through the record to piece together the facts it need[ed] to support a finding of unitary status." But it nonetheless announced its intention "to close this case and return [the District] schools to the state because oversight and control will be more effective placed in the hands of the public with the political system at its disposal to address any future issues."[14]

## C

The School District responded to the district court's order regarding the second prong of the unitary status inquiry with a Student Assignment Report purporting to show that it had eliminated the vestiges of discrimination in student assignment. Included were two expert reports that the District

---

[14]In its August 21, 2007, order, the district court also found unconstitutional the School District's race-based student transfer policy in operation at the time. Neither the Fisher plaintiffs nor the Mendoza plaintiffs challenge this holding on appeal, and the policy has since been repealed. Accordingly, we do not address it.

described as providing "a comprehensive review of the impact of [its] student assignment plans and student transfer policies from 1976 to [2007]" and as "support[ing] a finding that the District [ ] operated in good faith with regard to student assignment since the [Settlement Agreement] was entered."[15]

In their response to the District's Student Assignment Report, the Mendoza plaintiffs presented a report by Dr. Leonard B. Stevens arguing that the District "should not be found unitary in student assignment, because it has failed to meet its desegregation obligation." In their response, the Fisher plaintiffs presented a report by Dr. James T. Schelble that challenged the court's analytical model and alleged that the District's Student Assignment Report "clearly shows that [it] has failed to satisfy the Court's Order to document its compliance with the terms of the [Agreement] addressing student assignment."

The district court responded to the School District's Student Assignment Report and the plaintiffs' objections in an order in which it made its second preliminary finding that the School District had achieved unitary status. *See Fisher v. Tucson Unified Sch. Dist. No. One*, 549 F. Supp. 2d 1132 (D. Ariz. 2008). Adopting as its own the facts stated by the School District in its Report, the court found that the District had satisfied the second prong of the unitary status inquiry: "[T]he ethnic and race ratios required under the Settlement Agreement desegregation plans were implemented and maintained for 5 years, and eliminated to the extent practicable the vestiges of *de jure* segregation." Still, even as it approved the District's progress with regard to student assignment—and then only in the early years of its operation under the Settlement Agreement[16]—the court noted significant deficiencies

---

[15]Dr. William A.V. Clark's report described demographic change in the district. Dr. David J. Armor's report focused on the District's student assignment policies.

[16]Interpreting the Settlement Agreement as binding the School District "to affirmatively combat segregation" and "at the very least . . . to not

with regard to other *Green* factors[17] and did not address certain *Green* factors at all, including transportation, extracurricular activities, and facilities.

As to the first prong, the court concluded that the School District "failed to act in good faith in its ongoing operation . . . under the Settlement Agreement." The court was most critical of the District's efforts at gauging its progress toward desegregation, finding that it had "fail[ed] to monitor, track, review and analyze the effectiveness" of its programs and policies and therefore had not demonstrated a good faith adherence to the Settlement Agreement or the constitutional principles that underlie it. The court focused on the District's shortcomings regarding student assignment, finding that it had "failed to make the most basic inquiries necessary to assess the ongoing effectiveness of its student assignment plans, policies, and programs."[18] But the court's concerns extended to

exacerbate racial imbalances caused by [ ] demographic changes," the court found that after the first five years of its operation under the Agreement, the District's student assignment programs, practices, and procedures "had no net effect on [ ] demographic segregation," and in some cases had even "exacerbated the inequities" such segregation caused.

[17]The court criticized the District's efforts with regard to faculty and staff assignments, noting the overall underrepresentation of black teachers, and the concentration of Hispanic faculty at certain schools such that they were almost racially identifiable. The court also described the District's efforts with regard to disciplinary policies as sorely lacking, finding that "[o]nly recently, in 2004" had it "charged a responsible party to [work] to eliminate the over-representation of minority students in drop out, absenteeism, suspension, and expulsion rates."

[18]The court noted that the District's "lack of good faith [was] proven by the simple fact that [its] expert reports were only secured . . . to belatedly support its Petition for Unitary Status," and by the fact that it "fail[ed] to present any evidence that over the past 27 years it monitored and reviewed the effectiveness of its race and ethnic sensitive school boundaries, magnet programs, and open enrollment." The court made similar findings with regard to the District's programs for advanced and special education students.

other areas, as well.[19] The court concluded that "[e]ven if the data presented by the [District] were more persuasive, the [District's] lack of good faith is established by [its] failure to monitor the effectiveness of its ongoing operations to meet" desegregation goals.

Nonetheless, having concluded that the School District failed the good faith inquiry and having raised significant questions as to whether the District had eliminated the vestiges of racial discrimination to the extent practicable, the court announced its intention to grant the District's Petition for Unitary Status and terminate its jurisdiction. It stated that "successful desegregation will exist when the [District] is accountable to the public for its operation . . . in compliance with . . . principles of equality. In other words," the court continued, the District "will attain unitary status upon the adoption of a Post-Unitary Plan that ensures transparency and accountability to the public regarding the operation of a non-discriminatory school system." The court ordered the parties to meet and confer to finalize such a plan and held that, "[o]nce the [Plan] is adopted by the [District]," it would "grant the Petition for Unitary Status."[20]

---

[19]As with student assignment, the court found that the District had "failed to make the most basic inquiries necessary to assess the effectiveness of its recruitment, hiring, promotion, and placement of minority faculty to satisfy the provisions of the Settlement Agreement requiring regular review to guard against discrimination or inequities." The court further observed that the District had "failed to respond" to "legitimate and important" concerns that had been raised over staff cuts affecting predominantly minority schools. With regard to disciplinary policies, the court found that "the District [had] not undertaken a comprehensive analysis of suspension and expulsion data by ethnicity and race." Similarly, with regard to student achievement, the court found that except for an analysis conducted in 1982, the District had "failed to review student achievement as a measurement for program effectiveness" despite the fact that "ongoing review of program effectiveness is the only way to ensure that . . . program changes address demographic segregation and the quality of education for minority students."

[20]In anticipating its grant of the Petition, the district court rejected the District's request that it continue to exercise limited jurisdiction (without

Over the ensuing year, a committee consisting of representatives of the Fisher and Mendoza plaintiffs, experts, and District staff drafted a "Post-Unitary Status Plan," which the District's Governing Board adopted with amendments.[21] In a further order, the district court began its review of the Plan by stating that its "responsibility" was "to guard the public against future injury and restore true accountability to the public education system by returning it to the control of local authorities as soon as possible." The court wrote approvingly of most of the Plan's provisions, although it again expressed "concerns," which it stated that it shared with the Fisher and the Mendoza plaintiffs, "regarding the *Green* factors at issue in this case and expressly addressed in the [Settlement Agreement]."[22]

---

oversight). Stating that the request was motivated by the District's fear of losing appropriations provided by the state legislature pursuant to Ariz. Rev. Stat. § 15-910(G), the court found "that any benefit from its continued involvement in this case in the form of funding is offset by the disadvantages that result from suspension of public accountability that occurs during such periods."

[21]The Fisher and Mendoza plaintiffs challenge certain aspects of the "Post-Unitary Status Plan" and the procedure by which it was adopted. Because we conclude that the lower court erred when it declared the District unitary, we do not reach any questions regarding the adequacy of the so-called "post-unitary" proceedings.

[22]Namely, the court pointed to the "seriousness of the disparities that exist in the [D]istrict between the racial and ethnic makeup of the students and the faculty" and recognized that the Governing Board had rejected some proposed remedies "as being discriminatory against nonminority candidates." However, the court stated that, "[I]n the event the measures agreed to by the parties to address faculty diversity are unsuccessful, the data and evidence compiled pursuant to the Plan will enable" proper reconsideration by the District. The court again rested its confidence in the public's ability "to monitor the effectiveness of the Plan in improving faculty diversity and to participate in any public hearings held by the Governing Board to resolve any dispute over the statistical goals for staff diversity."

As we discuss below, the district court used the wrong standard to assess the School District's progress in the area of faculty assignments. *See post* at n.29.

Nonetheless, after it answered the plaintiffs' objections, the court ordered the Plan approved, declared the District unitary, and announced the end of "all federal juridical oversight" of the District.[23] The Fisher and Mendoza plaintiffs timely appealed.[24] The School District cross-appealed to the extent the district court's orders were adverse to it.

## III

**[1]** The district court's own findings are fatal to its determination that the School District has achieved unitary status. Supreme Court precedent is clear: in making a declaration of unitary status and terminating federal jurisdiction, a district court must determine that the School District has "complied in good faith with the desegregation decree since it was entered" and has eliminated "the vestiges of past discrimination . . . to the extent practicable." *Jenkins*, 515 U.S. at 89 (quotation omitted); *see Freeman*, 503 U.S. at 492; *Dowell*, 498 U.S. at 249-50. Nowhere are these requirements described as anything other than mandatory prerequisites to a determination of unitary status.[25] And of course they must be

---

[23]In addition, the court again affirmed that it would not maintain limited jurisdiction over the matter. Addressing the plaintiffs' request that it "retain jurisdiction over the case until further advances are made by the District" with regard to a two-year pilot student assignment program, the court acknowledged the "desire to shield the Plan from Governing Board interference" but concluded that the Plan's "Monitoring of Progress and Compliance" provisions were sufficient to "place[ ] the responsibility for [its] success . . . squarely on [the Governing Board's] doorstep."

[24]The United States as plaintiff-intervenor did not appeal. It did, however, accept our invitation to express its views on this matter and argues that the court below should be reversed.

[25]*See, e.g.*, *Freeman*, 503 U.S. 490 ("one of the *prerequisites to relinquishment of control . . . is* that a school district *has demonstrated* its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution" (emphasis added)); *id.* at 498 ("The *requirement* that the school district show its good-faith commitment to the entirety of a desegregation plan" guarantees "that parents, students, and

so, for "[a] school district which has been released from an injunction imposing a desegregation plan no longer requires court authorization for the promulgation of policies and rules regulating matters such as assignment of students and the like" and, so long as it does not violate the Equal Protection Clause, is not bound to follow through on the promises it has previously made. *Id.* at 250.

**[2]** Here, the district court determined that the School District "failed to act in good faith in its ongoing operation . . . under the Settlement Agreement." And even by reference to only certain of the *Green* factors, the court stated concerns about whether the District had sufficiently eliminated the effects of past *de jure* segregation. The court found that the School District had failed to make "the most basic inquiries necessary to assess the ongoing effectiveness of its student assignment plans;" had "exacerbated the inequities" of racial imbalances through its "failure to assess program effectiveness;" had "failed to respond" to "legitimate and important" concerns about staff cuts at minority schools; had "failed to comply" with the Settlement Agreement's requirement that it regularly review recruitment, hiring, and promotion in order to "guard against discrimination or inequities;" had never "undertaken a comprehensive analysis of suspension and expulsion data by ethnicity and race;" had not given "time and attention" to how the African American Studies Department could aid the quality education of minority students; and had failed to review program effectiveness in order to ensure quality education for minority students.

**[3]** The district court's decision to declare the School Dis-

---

the public have assurance against further injuries or stigma . . . . We stated in *Dowell* that the good-faith compliance of the district with the court order over a reasonable period of time *is a factor to be considered* in deciding whether or not jurisdiction could be relinquished." (emphasis added) (citing *Dowell*, 498 U.S. at 249-50)).

trict unitary on the basis of these findings cannot be reconciled with Supreme Court precedent. There is no authority for the proposition that a failure to demonstrate past good faith can be cured, and federal jurisdiction can be terminated, if a plan that merely promises future improvements is adopted. To the contrary, it is only "[a] *history* of good-faith compliance" that "enables the district court to accept [a school district's] representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." *Freeman*, 503 U.S. at 498 (emphasis added).[26] To be sure, district courts possess ample discretion to fashion equitable relief in school desegregation cases, to tailor that relief as progress is made, and to cede full control to local authorities at the earliest appropriate time. *See id.* at 486-92. Yet under our controlling precedent, the district court's extensive findings as to the School District's lack of good faith show that that time has not yet come to pass for Tucson. The district court's declaration of unitary status "is predicated on a misunderstanding of the governing rule of law" and is clearly erroneous. *Thornburg*, 478 U.S. at 79 (quotation omitted).

[4] In its cross-appeal, the School District argues that the district court's error instead lies in its determination that the District has not demonstrated good faith. However, the district court's factual conclusion is amply supported by the record. The District has produced no evidence to rebut the lower court's finding that the District failed to collect and analyze the data that would reveal whether its desegregation efforts were working. As such, the District has no means to show that its "policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Freeman*, 503 U.S. at 491. Indeed, as the district court found, because the School

---

[26]*See also Dowell*, 498 U.S. at 249 ("A district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future. . . . [I]n deciding whether to modify or dissolve a desegregation decree, a school board's [past] compliance . . . is obviously relevant.").

District "has been incapable of making logical or meaningful changes to its . . . policies, practices, or procedures related to desegregation," any progress "would have been mere coincidence." Good faith requires more.

We are well aware that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination" and therefore that desegregation decrees "are not intended to operate in perpetuity." *Dowell*, 498 U.S. at 247-48. Indeed, "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Freeman*, 503 U.S. at 490. After all, " 'local autonomy of school districts is a vital national tradition.' " *Id.* (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410 (1977)).[27]

Yet these principles do not permit a federal court to abdicate its responsibility to retain jurisdiction until a school district has demonstrated good faith and eliminated the vestiges of past discrimination to the extent practicable. Decades of Supreme Court precedent dictate that, where good faith lacks and the effects of *de jure* segregation linger, public monitoring and political accountability do not suffice. Only once a school district has "shown that [it] has attained the requisite degree of compliance" may a court craft "an orderly means for withdrawing from control." *Id.* Rightly so, for *"the court's end purpose must be to remedy the violation* and, in addition,

---

[27]As Justice O'Connor noted in her *Jenkins* concurrence:

> [I]n the school desegregation context, federal courts are specifically admonished to "take into account the interests of state and local authorities in managing their own affairs," *Milliken v. Bradley*, 433 U.S. 267, 281 . . . (1977) . . . , in light of the intrusion into the area of education, "where States historically have been sovereign," *United States v. Lopez*, 514 U.S. 549, 564 . . . (1995), and "to which States lay claim by right of history and expertise," *id.*[ ] at 583 . . . (Kennedy, J., concurring).

*Jenkins*, 515 U.S. at 113 (O'Connor, J., concurring).

to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Id.* at 489 (emphasis added) (citation omitted). Thus, "when a school district has *not* demonstrated good faith," the Supreme Court has "without hesitation approved comprehensive and continued district court supervision." *Id.* at 499 (emphasis added) (citations omitted).

**[5]** Accordingly, we do not hesitate to do so here. We reverse the court below and order it to maintain jurisdiction until it is satisfied that the School District has met its burden by *demonstrating*—not merely promising—its "good-faith compliance . . . with the [Settlement Agreement] over a reasonable period of time." *Id.* at 498.[28] The court must also be convinced that the District has eliminated "the vestiges of past discrimination . . . . to the extent practicable" with regard to all of the *Green* factors. *Id.* at 492 (quotation omitted).[29]

**[6]** The district court, of course, retains "the discretion to order an incremental or partial withdrawal of its supervision and control." *Id.* at 489. Specifically,

---

[28]*See also Dowell*, 498 U.S. at 248 ("Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.' " (citation omitted) (quoting *Spangler v. Pasadena City Bd. of Educ.*, 611 F.2d 1239, 1245 n.5 (9th Cir. 1979) (Kennedy, J., concurring))); *Anderson*, 517 F.3d at 297 & n.3.

[29]With regard to faculty and staff assignments, it is important to emphasize that the "proper comparison [is] between the racial composition of [the District's] teaching staff and the racial composition of the qualified public school teacher population in the relevant market." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977) (citation omitted). The School District acknowledges as much, although admits that it has never made this inquiry. The district court erred when it instead compared the racial and ethnic composition of a school's faculty and staff to that of its students.

*[w]hile retaining jurisdiction over the case*, the court may determine that it will not order further remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations.

*Id.* at 490-91 (emphasis added).[30] We leave it to the district court to decide whether partial withdrawal is warranted in this case. The court's "sound discretion" should be informed by these factors:

whether there has been full and satisfactory compliance with the [Settlement Agreement] in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the [Agreement] in other facets of the school system; and whether the [S]chool [D]istrict has demonstrated, to the public and to the parents and students of the once disfavored race[s and ethnicities], its

---

[30]The School District retains "the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494. But "as the *de jure* violation becomes more remote in time and . . . demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Id.* at 496. Still, good faith remains paramount: "The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Id.*

good-faith commitment to the whole of the [Agreement] and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Id.* at 491.

We remand for further proceedings in light of our opinion. We do not reach any of the additional arguments raised by the parties.

**REVERSED AND REMANDED.**