FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARIA MENDOZA, Individually and
on behalf of Stephen Mendoza;
EDWARD A. CONTRERAS,

*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-
Appellee*,

 and

ROY FISHER; JOSIE FISHER, Next
of kin to Elizabeth Fisher; BOYD
LEWIS; ELIZABETH LEWIS, Next
of kin of Elizabeth, Ellen, Warren, and
Jeff Lewis; LLOYD D. HALL;
VIRGINIA HALL, Next of kin of
Kenneth and Lloyd D. Hall; GEORGE
HUTTON; JOYCE BROWN
HUTTON, Next of kin of Mondre
Hutton,

*Plaintiffs*,

 v.

No. 22-16478

D.C. No.
4:74-cv-00090-
DCB

OPINION

TUCSON UNIFIED SCHOOL
DISTRICT,

*Defendant-Appellee*,

 and

SIDNEY L. SUTTON; SALLY J.
SUTTON, As Parents and Natural
Guardians and Next Friend of Sean
Sutton; JOHN R. CENTENO; MARY
KATHERINE CENTENO, As Parent,
Natural Guardians and Next Friend of
Sandra Katherine Centeno and James
Lee Centeno; LIBRADA G. RUIZ, As
Parent, Natural Guardian and Next
Friend of Andres L Ruiz; SIDNEY
TAIZE, AKA Sidney Taiz, As Parent,
Natural guardian and Next Friend of
Jonathan Taize, Lisa Taize and Joshua
Taize,

*Intervenor-Defendants*.

ROY FISHER; JOSIE FISHER, Next
of kin to Elizabeth Fisher,

*Plaintiffs-Appellants*,

UNITED STATES OF AMERICA,

*Intervenor-Plaintiff-*

No. 22-16479

D.C. No.
4:74-cv-00090-
DCB

*Appellee*,

and

MARIA MENDOZA, Individually and on behalf of Stephen Mendoza; EDWARD A. CONTRERAS; BOYD LEWIS; ELIZABETH LEWIS, Next of kin of Elizabeth, Ellen, Warren, and Jeff Lewis; LLOYD D. HALL; VIRGINIA HALL, Next of kin of Kenneth and Lloyd D. Hall; GEORGE HUTTON; JOYCE BROWN HUTTON, Next of kin of Mondre Hutton,

*Plaintiffs*,

v.

TUCSON UNIFIED SCHOOL DISTRICT,

*Defendant-Appellee*,

and

SIDNEY L. SUTTON; SALLY J. SUTTON, As Parents and Natural Guardians and Next Friend of Sean Sutton; JOHN R. CENTENO; MARY KATHERINE CENTENO, As Parent, Natural Guardians and Next Friend of

Sandra Katherine Centeno and James Lee Centeno; LIBRADA G. RUIZ, As Parent, Natural Guardian and Next Friend of Andres L Ruiz; SIDNEY TAIZE, AKA Sidney Taiz, As Parent, Natural guardian and Next Friend of Jonathan Taize, Lisa Taize and Joshua Taize,

*Intervenor-Defendants*.

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted December 6, 2023
San Francisco, California

Filed January 15, 2025

Before: Daniel P. Collins, Danielle J. Forrest, and Jennifer Sung, Circuit Judges.

Opinion by Judge Forrest

# SUMMARY[*]

## School Desegregation

Affirming the district court's judgment for the Tucson Unified School District No. 1 in two consolidated school desegregation class actions, the panel held that federal judicial oversight over the District was no longer warranted because the District had achieved unitary status, which occurs when a school system transitions to a unitary, nonracial system of public education.

In the 1950s, the District had a "dual school system for Blacks and non-Blacks." Class action lawsuits brought in 1974 on behalf of African American and Latino students resulted in a finding that some schools continued to suffer the effects of the District's past intentional discrimination. In 1978, the district court approved a settlement agreement and desegregation decree. Since then, the district court has directed the District to undertake numerous efforts to remedy the effects of its past discrimination and bring the District into unitary status. In 2013, following a remand by this court, a unitary status plan (USP) was created that set out detailed plans to address various factors to achieve unitary status. Across numerous orders entered from 2018 through 2022, the district court found that the District had achieved unitary status in various educational areas. In 2022, the district court ordered the end of supervision.

The panel held that the district court applied the correct standard in granting unitary status and terminating oversight.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Perfect implementation of the USP was neither necessary nor sufficient to prove the elements of unitary status. Rather, the ultimate inquiry for unitary status is (1) whether the district complied in good faith with the desegregation decree since it was entered, and (2) whether the vestiges of past discrimination have been eliminated to the extent practicable.

Evaluating multiple aspects of the District's education system to assess whether vestiges of past discrimination had been eliminated, the panel found no error in the district court's conclusions that: (1) vestiges of discrimination in student school assignments had been eliminated to the extent practicable; (2) there was no racial disparity resulting from past *de jure* segregation in transportation services; (3) to the extent that racial imbalances remained in staffing, they had been eliminated to the extent practicable and were not the result of past *de jure* segregation or current discrimination; (4) unitary status had been achieved in education quality; (5) to the extent that racial imbalances existed for disciplinary actions involving African American students, they had been eliminated to the extent practicable and were not the result of past *de jure* segregation or current discrimination; (6) unitary status was achieved in implementing family and community engagement strategies; and (7) the District sufficiently complied with USP's transparency and accountability requirements.

The panel held that the district court properly found that the District demonstrated good-faith compliance with the USP for the six years since the USP was established, which was a reasonable period of time to establish a lasting commitment to the USP and the Constitution. The District demonstrated that it was capable of making meaningful changes to its policies, practices, and procedures related to

desegregation by complying with the wide-ranging requirements imposed by the USP and with the district court's supplemental orders, notices, and the like.

## COUNSEL

Ernest I. Herrera (argued), Luis L. Lozada, and Thomas A. Saenz, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Rubin Salter Jr. (argued), Law Office of Rubin Salter Jr., Tucson, Arizona; for Plaintiffs-Appellants-Cross-Appellees.

Anna M. Baldwin and Bonnie Robin-Vergeer, Attorneys, Civil Rights Division, Appellate Section, United States Department of Justice, Washington, D.C., for Intervenor-Plaintiff-Appellee.

Bennett E. Cooper (argued), Paul B. Converse, and Amanda Newman, Dickinson Wright PLLC, Phoenix, Arizona, for Defendant-Appellee-Cross-Appellant.

**OPINION**

FORREST, Circuit Judge:

"[R]acial discrimination in public education is unconstitutional." *Brown v. Bd. of Educ.*, 349 U.S. 294, 298 (1955). To "eliminate from the public schools all vestiges of state-imposed segregation," *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971), the Supreme Court confirmed that federal district courts have the responsibility of "fashioning and effectuating [desegregation] decrees," *id.* at 12 (quoting *Brown*, 349 U.S. at 300). Local school authorities have an "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," and district courts have "broad" equitable powers to ensure school authorities fulfilled these obligations. *Id.* at 15 (quoting *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437−38 (1968)). "From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 247 (1991). Federal desegregation decrees must be dissolved once a school system "*transition[s]* to a unitary, nonracial system of public education," *id.* at 248 (quoting *Green*, 391 U.S. at 436). This is referred to as being in "unitary status," and it is achieved when a school system has "complied in good faith with the desegregation decree," and "the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Id.* at 249−50.

The Tucson Unified School District No. 1 (the District) has been under federal supervision for 50 years. In the 1950s,

the District had a "dual school system for Blacks and non-Blacks." *Mendoza v. United States*, 623 F.2d 1338, 1341 (9th Cir. 1980). Class action lawsuits brought on behalf of African American and Latino students (the Students) resulted in a 1978 settlement agreement and desegregation decree. Since that time, the district court has directed the District to undertake numerous efforts to remedy the effects of its past discrimination and bring the District into unitary status.

In the late 2000s, the district court made preliminary findings that the District had achieved unitary status, and it ultimately approved a Post-Unitary Status Plan and declared that the District had achieved unitary status. *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1138–41 (9th Cir. 2011). We reversed in 2011 because the district court inconsistently had found that the District did not comply with its obligations under the settlement agreement in good faith, and we remanded for further supervision until the unitary-status requirements were satisfied. *Id.* at 1142–43 ("The district court's declaration of unitary status is predicated on a misunderstanding of the governing rule of law and is clearly erroneous.") (internal quotation marks and citation omitted). On remand, the district court appointed a special master to create a unitary status plan (USP) with the parties. By 2013, the USP was the governing desegregation decree. Over the next nine years, the District implemented the USP, although not without significant litigation and court supervision. Across numerous orders entered from 2018 through 2022, the district court found that the District had achieved unitary status, and it ordered the end of supervision. The Students appealed, asserting that unitary status still has not been achieved.

We acknowledge the parties' and the district court's persistent and important efforts undertaken to remedy the effects of the District's past *de jure* segregation. And today we conclude that the district court's work is done. We agree that the District is now operating in unitary status under the test established by the Supreme Court, and, therefore, it is time to return control of the District back to local authorities.

## I.    BACKGROUND

In 1974, the Students—the Fisher plaintiffs representing African American students and the Mendoza plaintiffs representing Latino students—brought two desegregation actions against the District, which were consolidated. The district court held a bench trial in 1977, after which it found that some schools continued to suffer the effects of the District's past intentional segregation, and it ordered the District to prepare a desegregation plan. The following year, the district court approved the parties' stipulated settlement, including their proposed desegregation plan. For nearly 30 years, the settlement agreement functioned as "the desegregation decree at the center of this case." *Fisher*, 652 F.3d at 1137.

In 2005, the District petitioned for unitary status, seeking an end of federal oversight. The district court granted the District's petition, approved a Post-Unitary Status Plan, and relinquished federal supervision. *Id.* at 1138–41. We reversed in 2011 because "the district court's extensive findings as to the School District's lack of good faith" in complying with its obligations under the governing decree were "fatal to its determination that the School District has achieved unitary status." *Id.* at 1141–42. We remanded the consolidated cases to the district court with instructions that it "maintain jurisdiction until it is satisfied that the School

District has met its burden" to show unitary status. *Id.* at 1143.

The district court appointed a special master to develop a USP with the parties. In 2013, the district court adopted a consent order that "consist[ed] of the Unitary Status Plan jointly proposed by the Parties, reached after months of negotiations." The proposed USP was structured around the six *Green* factors that "measure" the vestiges of *de jure* segregation, *Freeman v. Pitts*, 503 U.S. 467, 486 (1992), and it set out detailed plans to address student assignment, transportation, administrators and certified staff, quality of education, discipline, family and community engagement, extracurricular activities, facilities and technology, and accountability and transparency. The USP provided that the District could petition for unitary status in 2017.

In 2018, after the District and Special Master had filed reports about the District's compliance with the USP, the district court partially granted unitary status as to the USP provisions "where it [wa]s confident that there ha[d] been full and satisfactory compliance." The court declined to "grant unitary status in full because it f[ound] that the School District ha[d] not yet demonstrated to the public, including African-American and Hispanic parents and students, its good-faith commitment to the whole of the USP and to those provisions of the law and the Constitution that predicated judicial intervention." All parties appealed, but we dismissed these interlocutory actions for lack of jurisdiction. *See Fisher v. Tucson Unified Sch. Dist.*, Nos. 18-16926, 18-16982, 18-16983, 2019 U.S. App. LEXIS 22488, at *2 (9th Cir. July 29, 2019) (dismissing the District's appeal); *Fisher v. Tucson Unified Sch. Dist.*, 813 F. App'x 310, 311 (9th Cir. 2020) (dismissing the Students' appeal).

In 2021, the district court found that the District had achieved unitary status except for two subsections of the USP. The court "retain[ed] jurisdiction for the limited purpose of determining compliance with th[o]se remaining contingencies." Thereafter, the litigation primarily focused on formulating and implementing the "post unitary status plan to guide the District in maintaining constitutional compliance after the release of court supervision." Over the course of a year, and with several ordered revisions from the district court, the District developed a Post Unitary Status Reporting and Accountability Plan.

In July 2022, the district court again found that the District had attained unitary status, and it relinquished federal supervision over the District, dissolved the 1978 settlement agreement, and entered judgment for the District. This appeal followed.

## II.   DISCUSSION

### A.  Legal Framework

A school district achieves unitary status when it "has been brought into compliance with the command of the Constitution." *Dowell*, 498 U.S. at 246. "[T]he term 'unitary' does not have fixed meaning or content." *Freeman*, 503 U.S. at 487. The "ultimate inquiry" for unitary status is whether the district "ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) (alteration in original).

The good-faith element is imprecisely defined. In *Dowell*, the Supreme Court described it as a retrospective analysis of "whether the [school district] had complied in

good faith with the desegregation decree since it was entered." 498 U.S. at 249–50. It has further elaborated that the question is "whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention." *Freeman*, 503 U.S. at 491. When considering whether a school district "has accepted the principle of racial equality and will not suffer intentional discrimination in the future," courts can look for both a "history of good-faith compliance" with the desegregation plan and "policies [that] form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Id*. at 491, 498. In contrast, "a plan that merely promises future improvements" cannot cure "a failure to demonstrate past good faith." *Fisher*, 652 F.3d at 1142.

The second element—elimination of the vestiges of past *de jure* discrimination—is evaluated looking at multiple aspects of education systems. These are referred to as the *Green* factors: student assignments, faculty assignments, staff assignments, transportation, extra-curricular activities, and facilities. *Dowell*, 498 U.S. at 250 (citing *Swann*, 402 U.S. at 18). But "the *Green* factors need not be a rigid framework," and courts may consider other relevant factors. *Freeman*, 503 U.S. at 493.

Critically, inequality is not automatically a vestige of segregation or discrimination. "The vestiges of segregation that are the concern of the law in a school [desegregation] case may be subtle and intangible but nonetheless they must be so real that they have a *causal link* to the *de jure* violation being remedied." *Freeman*, 503 U.S. at 496 (emphasis added). For example, a circumstance that affects the racial

makeup of a school, like "white flight," is not a vestige of segregation unless it is "traceable, in a proximate way, to constitutional violations." *Id.* at 491; *see also Pasadena Bd. of Educ. v. Spangler*, 427 U.S. 424, 435-36 (1976). When a plaintiff demonstrates "current [racial] imbalance," the school district has the burden to show that it "is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494. "As the *de jure* violation becomes more remote in time" and other forces—such as demographic change— "intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Id.* at 496. Additionally, "[t]he causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Id*.

Once a school district meets its burden to show that it has complied with the desegregation decree in good faith and has eliminated the vestiges of past discrimination to the extent practicable, the district court must dissolve the desegregation decree and terminate its supervision. *Dowell*, 498 U.S. at 247–48; *Fisher*, 652 F.3d at 1142. Where a school district demonstrates unitary status in some but not all facets of its system, "a district court is permitted to withdraw judicial supervision with respect to discrete categories in which the school district has achieved compliance with a court-ordered desegregation plan." *Freeman*, 503 U.S. at 471.

We review the district court's conclusions of law de novo and its findings of facts for clear error. *Fisher*, 652 F.3d at 1136. "Proper resolution of any desegregation case turns on a careful assessment of its facts," *Freeman*, 503 U.S. at 474, and appropriate deference must be afforded to "the views of the [district court] judges who have lived with the case over the years," *Columbus Bd. of Educ. v. Penick*, 443

U.S. 449, 457 n.6 (1979). Thus, our clear-error review of the district court's factual findings, "including its finding of unitary status," is "significantly deferential." *Fisher*, 652 F.3d at 1136 (internal quotation marks and citation omitted). We must be "left with a definite and firm conviction that a mistake has been committed" before we can set aside a factual finding. *Id.* (internal quotation marks and citation omitted); *see also D.O.ex rel. Walker v. Escondido Union Sch. Dist.*, 59 F.4th 394, 405 (9th Cir. 2023).

We are not inhibited from "correct[ing] errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Fisher*, 652 F.3d at 1136 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). But "deferential review of mixed questions of law and fact is warranted when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233 (1991) (citation omitted).

## B. Unitary Status Plan

When this case was remanded in 2011, both the district court and the parties faced "a dilemma because the express terms and provisions of the 1978 Settlement Agreement had been long ago implemented and were undisputedly outdated." To address this problem, the district court appointed a special master to help formulate a USP "designed to address the *Green* factors relevant to attaining unitary status in this case." Once adopted, the USP became the governing desegregation decree. The USP's introduction described it as a "Consent Order . . . to resolve the longstanding desegregation case against the District." The

district court likewise indicated that it viewed the USP as "guid[ing] [its] determination of unitary status" because the USP "replaced the 1978 Settlement Agreement as the operative consent decree." To achieve unitary status, therefore, the District had to show that it complied in good faith with the USP after it was entered and, separately, that it eliminated the vestiges of past discrimination to the extent practicable. *Jenkins*, 515 U.S. at 89.

The district court applied the correct standard in granting unitary status. To illustrate, in its 2018 order partially granting unitary status, the district court explained that it would terminate court supervision "when the District has demonstrated good faith implementation, monitoring, revision, and operation of the District under the USP for at least three years *and* the elimination of the vestiges of past discrimination to the extent practicable." (emphasis added). In so doing, the district court explicitly recognized that good-faith compliance and elimination of the vestiges of discrimination are separate requirements that must be met before unitary status may be granted. In its 2021 unitary status order, the district court likewise correctly assessed each requirement separately, although it framed them both in relation to the USP.[1]

---

[1] The district court did misstate the standard in one place in its 2022 order granting judgment for the District. The final paragraph of that order states the district court found that the District had obtained unitary status because

> it has demonstrated a good faith commitment to eliminate the vestiges of past discrimination to the extent practicable by complying with the terms and

In challenging the district court's finding of unitary status, the Students do not structure their arguments around the two elements established by the Supreme Court. Instead, they primarily focus on the District's failure to fully comply with and accomplish the USP's stated goals. They implicitly adopt the premise that perfect implementation of the USP is the same as—and a prerequisite for—achieving unitary status. The district court rejected that framework.**[2]** And so do we. As the USP's preamble states, this plan is designed to ensure that the *Green* factors would be adequately considered. The *Green* factors are not a mandatory checklist that applies the same in every case. *See Jenkins*, 515 U.S. at 88. "[F]ederal-court decrees must directly address and relate to the constitutional violation itself." *Id.* (internal quotation marks and citation omitted). Simply put, perfect

---

> provisions of the 1978 Stipulation of Settlement for at least five years and by developing and implementing the USP and its plans and programs to address such vestiges and the *Green* factors, and by operating the District pursuant to the USP from approximately 2013 to date.

This statement seemingly conflates the two elements of unitary status. Nevertheless, we conclude that this was not reversible error because the district court's substantive analysis makes clear that the court applied the standard correctly.

[2] The district court found that although meeting the USP's "goals or standards for anticipated improvement" demonstrated that "a program ha[d] effectively attained the program goal . . ., the reverse is not true." Indeed, failing to meet a standard "does not mean that a USP strategy is ineffective." Instead, the district court explained that "[t]he showings of ineffectiveness mean the Court must instead look to the District's good faith compliance with the USP provisions and strategies that were research based and designed based on best practices to be effective in attaining the USP goals of integration, closing the student achievement gap, etc."

implementation of the USP is neither necessary nor sufficient to prove the elements of unitary status. Accordingly, in reviewing the Students' eight USP-specific claims, we consider whether they have established legal or factual error in the district court's application of the two unitary-status elements.

## 1.   Student Assignment (USP § II)

Section II of the USP directs that "[s]tudents of all racial and ethnic backgrounds shall have the opportunity to attend an integrated school." This section required the District to use four specified "strategies for assigning students to schools" to attain integrated education, including: "attendance boundaries; pairing and clustering of schools; magnet schools and programs; and open enrollment." Regarding magnet schools, the USP directed the District to "recruit a racially and ethnically diverse student body to its magnet schools and programs to ensure that the schools are integrated to the greatest extent practicable."

In 2018, the district court adopted the special master's recommendation and granted unitary status for § II, except as applied to the District's magnet program. The district court discussed two countervailing factors. First, it took "a hard look at student assignment because it is one of the vestiges expressly addressed in the original 1978 Settlement Agreement" that was originally remedied by busing students and changing school boundaries. Second, it recognized that because Arizona allows students to "attend any school by choice . . . with charter and out-of-District schools competing for student enrollment, . . . student assignment strategies aimed at remediating segregation are more limited, less direct, and less effective." "[P]utting aside [the District's] ambivalence with respect to magnets," the district

court found that the District "ha[d] done those things with respect to student assignments that it was required to do by the USP." It specifically recounted statistics showing recent "reduction in Racially Concentrated schools" and increase in "Integrated schools."

The district court found that magnet schools were the District's "primary tools for integration" due to the District's "geographic and demographic characteristics" and that Arizona's "policy not only strongly supports charter schools but essentially incentivizes suburban schools to recruit students from more diverse Districts." The district court assessed the status of the District's magnet program in detail and ultimately adopted "the Special Master's request that the District demonstrate its commitment and capability to identify and implement new magnet schools and programs to maintain a vibrant magnet plan which affords future increased opportunities for [District] students to benefit from an integrated education."

The district court revisited the District's magnet program in 2021 and granted full unitary status as to § II. At the outset, the district court stated that it had "not rutted through the record further . . . to tickle out how many more students are now in Integrated or highly diverse school environments [compared to 2018] because the numbers are not dispositive." Instead, it noted the continued trend of reduced Racially Concentrated schools and increased Integrated schools and found that it was "enough that the data reflects progress at this time under the USP to integrate the District's schools to the extent practicable." The district court also reiterated that "[t]he District's ability to eliminate racial concentration in its schools is limited because Arizona law requires open enrollment and allows charter schools . . . leaving the District with the primary strategy of

magnet schools to voluntarily integrate the District which is almost 80% minority."

In this appeal, the Students allege that the district court failed to apply the "correct legal standard" in 2021, which they contend "was that the USP required [the District] to have district-wide integration across all schools and not solely magnet schools." Of particular importance, however, the Students do not argue that the district court erred because remaining racial disparities in student populations are a vestige of *de jure* discrimination. Nor do they point to evidence that would support this contention. At best, they say that the District "is not excused from meeting its USP obligations under the guise of demographic changes when [it] has not shown whether those changing demographics are attributable to private, rather than state action."

The Students have not demonstrated that the district court applied the wrong legal standard in concluding that the vestiges of discrimination in student assignments had been eliminated to the extent practicable. It simply is not the law that *all* racial disparity must be eliminated before a desegregation degree can be extinguished. "The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities." *Dowell*, 498 U.S. at 248. If the local authorities are no longer discriminating and "have operated in compliance with [a desegregation decree] for a reasonable period of time," *id.*, then the federal court should heed the counsel that its "supervision of local school systems was intended as a temporary measure *to remedy past discrimination*" and return control back to the local authorities, *id.* at 247 (emphasis added). And that is what the district court did here when it concluded, after extensive, careful, and thorough

supervision, and based on an extensive factual record, that the District achieved unitary status regarding student assignments. We find no error.[3]

## 2. Transportation (USP § III)

Section III of the USP mandated that "[t]he District shall utilize transportation services as a critical component of the integration of its schools." In 2018, the district court adopted the special master's conclusion that the District was meeting this requirement. The district court noted that although intuitively "ridership should mirror increases in students attending magnet schools and reductions in Racially Concentrated schools," the data showed that was not the case. It cautioned the District that because "[t]ransportation is critical to attaining the USP's goals," understanding ridership "should inform the District as it moves forward to plan for the future." The court found unitary status as to § III because the district had satisfied the USP's transportation-specific requirements, but it retained jurisdiction over transportation to the extent that it was intertwined with other aspects of the USP for which unitary status had not been achieved, including the District's magnet program.

In 2021, the district court found unitary status under § III "contingent" on the District satisfying a § V requirement to "fil[e] the Final [Advanced Learning Experiences] Policy Manual with corresponding revisions to the Transportation

---

[3] The Students challenge the district court's direction that—post-unitary status—the District could measure integration based on a 25% variance between any ethnic or racial group in a certain school compared to the District's average for that grade level, instead of the USP's 15% metric. This challenge is not tied to the relevant legal standard or, for that matter, any legal authority that suggests a certain metric is required *after* unitary status is achieved.

Plan." The district court explained: "There is no allegation of discrimination. There is no racial disparity resulting from past *de jure* segregation in transportation services." And it determined that "[t]he burden of transportation necessary to integrate the District" was "reasonable because commute times are limited to approximately 20 minutes," even though this burden fell "most heavily" on African American and Latino students living in racially-concentrated neighborhoods.

The Students raise two challenges. First, they assert that the district court erred in awarding unitary status regarding transportation while at the same time acknowledging that transportation was interconnected with other requirements of the USP that the District had not satisfied. We disagree. The district court properly identified aspects of transportation that were interconnected with USP provisions where the District had not achieved unitary status and retained jurisdiction as to those issues. *Freeman* does not support the Students' contention that the district court had to retain jurisdiction over all aspects of transportation because some aspects were interconnected with other unresolved requirements. 503 U.S. at 471.

Second, the Students assert that the District "failed to meet its USP obligations because it did not provide transportation for all schools and programs." Because this claim is unsupported by citation to record evidence or case law, we do not consider it further. *See Blumenkron v. Multnomah County*, 91 F.4th 1303, 1317 (9th Cir. 2024) (concluding that the plaintiffs abandoned their claims on appeal because their argument was "vague, unsupported by any citations to case authority, and untethered to the applicable legal standards"); *Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.8 (9th Cir. 2014) (declining to consider a

contention "not supported by citations to the record, argument, or any legal authority").

### 3.  Administrators and Certified Staff (USP § IV)

Section IV of the USP directed the District to "seek to enhance the racial and ethnic diversity of its administrators and certificated staff through its recruitment, hiring, assignment, promotion, pay, demotion, and dismissal practices and procedures." The district court found that unitary status was achieved under § IV in 2021. Specifically, it found that the "severe national teacher shortage" and Arizona's low teacher salaries were "fundamental" obstacles to the District's "efforts to recruit diverse teaching staff." It also found that those obstacles "are further compounded for African American certificated staff because in Arizona, the African American population is only about five percent, and only about 4 percent of the teachers in the entire District are African American." In fact, the district court determined, based on the data presented, that the District could only attain its diversity goals by recruiting new African American staff "from out-of-state." Despite these limitations, the court recounted that the District had hired a Diversity Recruitment Director and "developed and implemented diversity plans for both teachers and administrators," which included an addendum focused on strategies to recruit and hire African American teachers and administrators. Based on this record, the district court did not clearly err in finding that "[t]o the extent that racial imbalances remain in certificated staff and administrators, they have been eliminated to the extent practicable and are not the result of past *de jure* segregation or current discrimination."

The Students challenge this finding because "[t]he USP calls for racially diverse faculty and staff." They insist that

the District "cannot blame outside forces, such as a national teacher shortage or poor pay, for excusing itself from complying with its obligation under the USP. T[he District] has the responsibility to increase the salary of its teachers to reduce attrition and attract out-of-state teachers to promote the diversity of its staff." Again, this argument fails. The Students do not offer any analysis to disturb the district court's factual finding that racial imbalances among staff are not a vestige of past discrimination. To the extent that they challenge the district court's good-faith finding because the outcome sought by the USP was not met, we reject their claim. As discussed, a school district can act in good faith even if it does not achieve specific outcomes. There can be reasons that lie beyond a school district's control for why a particular objective has not or cannot be attained, as the district court noted. And in that circumstance, the failure to obtain a particular objective is not instructive regarding good faith. *See Fisher*, 652 F.3d at 1135 n.4 (citing cases). But, of course, if the record shows that an objective of a desegregation decree was not achieved for reasons that *are* within a school district's control, the analysis will depend on the circumstances presented.

Here, the record does not demonstrate that the District disregarded the district court's directives regarding staff diversity. And the district court specifically addressed the external factors that prevented the District from fully meeting the goals set forth in the USP. Thus, the district court's finding of unitary status related to staff diversity does not conflict with its good-faith finding.

### 4. Quality of Education (USP § V)

Section V of the USP governs the quality of education provided by the District with the purpose of "improv[ing] the

academic achievement of African American and Latino students" and ensuring that they "have equal access to the District's Advanced Learning Experiences." In 2018, the district court found that the District had achieved partial unitary status under this section, except as to subsections A (access/support in advanced learning experiences), C (dual language programs), E (partially) (student engagement and support), and F (maintaining inclusive school environments). The district court ultimately found that the District had achieved unitary status under this section.

The Students' objections to the district court's findings regarding § V are vague. They initially argue that although the District "created and implemented several programs to address" the "educational obstacles faced by Black and Latino Students," it "did not track or monitor whether these programs were effective in eliminating racial problems mandated by the USP." They contend that the District "failed to meet its burden under USP, § V" because it failed to provide evidence that it had closed the achievement gap.

This argument is unconvincing. Again, the Students' challenge is entirely divorced from the unitary-status standard. To the extent that the Students argue the achievement gap is a vestige of discrimination, they do not point to evidence demonstrating the district court's contrary finding was clearly erroneous. This is significant because achievement gaps are not a *Green* factor and, therefore, the Students must prove that this circumstance is a vestige of former *de jure* segregation. *See Coal. to Save Our Child. v. State Bd. of Educ.*, 90 F.3d 752, 776–77 (3d Cir. 1996) (holding that non-*Green*-factor circumstances are not presumed to be vestiges of *de jure* segregation and instead must be shown by plaintiffs to be so); *People Who Care v. Rockford Bd. of Educ.*, 246 F.3d 1073, 1076–77 (7th Cir.

2001) (recognizing that many potential causes of an achievement gap are not traceable to discrimination by school authorities); *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 330–31 (4th Cir. 2001) (listing cases that have concluded achievement gaps are not vestiges of past discrimination in education). The Students have not done so here.

Likewise, the Students' only argument related to good faith is that the District failed to achieve the USP's ambitious goals. We have already explained that this argument is based on a false premise. Additionally, the Students have not pointed to any evidence that undermines the district court's finding that the District acted in good faith regarding § V.

The Students insist that the District "should have analyzed the effects of the Covid-19 pandemic on minority students and adjusted its programs appropriately." This argument does not address whether the District acted in good faith. The USP naturally did not contemplate the pandemic, and so this kind of assessment was not required. And to the extent this is intended as a vestiges-of-discrimination argument, the Students fail to show a causal connection to past *de jure* discrimination. *See Fisher*, 652 F.3d at 1136.

### 5. Student Discipline (USP § VI)

Section VI of the USP addresses student-discipline practices. In April 2021, the district court found that the District had achieved unitary status related to this section. The district court particularly credited the District's

alternative education program (DAEP),[4] which was "far superior to out-of-school exclusionary discipline." The district court found that "the overall trend is a reduction in the differences in discipline rates between African American and White students" and that "compared to national averages in other school districts, African American students receive less disciplinary measures in [the District]." More important for present purposes, the district court found that "[t]o the extent that racial imbalances exist for disciplinary actions involving African American students, they have been eliminated to the extent practicable and are not the result of past *de jure* segregation or current discrimination." It also found good-faith compliance with the court's directives related to this issue.

The Students do not expressly challenge these findings. Instead, their challenge arises from an October 6, 2021, order recounting that the special master asserted in a report that the District proposed eliminating DAEP in its 2022–23 budget. The district court ordered the District to "complete a [performance impact analysis] to assess the impact of the proposed termination of DAEP" and, as an intermediary step, to "show good cause why the Court should not stay the termination of DAEP pending this review." After reviewing the parties' responses to the order to show cause, however, the district court found "no evidence that DAEP is being terminated." Rather, the evidence showed "a change in DAEP operations" between 2020 and 2022, partially "attributable to the COVID-19 pandemic." As to the changes

---

[4] The DAEP is "the District's alternative for out-of-school suspensions" and was "one of the backbone strategies developed by the District to comply with USP § VI." It was "designed to address the disproportionate impact of punitive discipline on Latino and African American [] students."

unrelated to the pandemic, the district court found that they "*may* impact program effectiveness of a substantive USP provision, and, therefore, require the District to conduct a Performance Impact Analysis to determine that to the extent practicable the changes address racial segregation and improve academic performance and quality of education for Latino and African American students." (emphasis added).

The Students argue that the district court's "conclusion"—after finding unitary status—that the District had made "potentially detrimental changes to an important disciplinary program and [the district court's] deferral of restoration of DAEP until after a grant of full unitary status demonstrates how [the District] failed to comply with the USP." We disagree.

The "district court is permitted to withdraw judicial supervision with respect to discrete categories in which the school district has achieved compliance with a court-ordered desegregation plan." *Freeman*, 503 U.S. at 471. And once the district court found that the District had achieved unitary status related to § VI, the District was no longer bound by the substantive provisions of that section of the USP. *See id.* at 491 (holding that once a court determines that a district is in compliance with "some but not all areas," the court "may return control to the school system in those areas where compliance has been achieved"). Because the Students do not challenge the facts underlying the district court's finding that the District was in unitary status as to § VI—that the District eliminated any vestiges of discrimination related to discipline and complied with the USP's discipline provision in good faith—and we are not "left with a definite and firm conviction that a mistake has been committed," we discern no error. *Escondido Union Sch. Dist.*, 59 F.4th at 405.

### 6.  Family and Community Engagement (USP § VII)

Section VII established that "[f]amily and community engagement is a critical component of student success," and it required the District to employ family and community engagement (FACE) strategies, such as outreach plans, providing information about other USP services and programs, "learning from families how best to meet the needs of their children," and "collaborating with local colleges and universities and community groups to provide information and guidance designed to improve the educational outcomes of African American and Latino students." The district court recognized that § VII is a "major component" of the USP because it "is a multi-provision, multi-departmental program," the "breadth" of which "is both its strength and weakness."

In September 2018, the district court found "that the only remaining question relevant to awarding unitary status for VII . . . is the implementation of a districtwide strategy for [FACE] services at school-sites and an effective data gathering and tracking program." On the first point, the district court recounted that the special master had advised that "the most effective strategies for addressing education-related issues occur at the school-level where families have a greater incentive to be involved in the pursuit of strategies to enhance learning opportunities and outcomes of their own children." The district court questioned whether the District's "heavy reliance on the African American Student Support Department (AASSD) and the Mexican American Student Support Department (MASSD) . . . w[as] the most effective means of delivering FACE services." Therefore, the district court granted unitary status as to § VII except as related to school-site services and data collection and tracking, and it directed the District to "file an update to the

FACE Action Plan, reflecting the directives contained in this Order and cross-referencing the District's Post-unitary Status AASS or MASS Plan as relevant," after the parties had completed consultation with experts.

As directed, the District filed operation plans for both AASSD and MASSD in December 2018. The Students did not object to these plans. After reviewing the revised plan, the district court ordered "further revision to the FACE Action Plan related to its heavy reliance on AASSD and MASSD for delivery of services" because the District "failed to clearly define the interconnectivity between the FACE Department and the two student support service departments." The district court noted that the post-unitary operations plans for the two minority student-services departments "remained unacceptable to the Special Master as . . . being wasteful duplications of effort of tasks more effectively performed by other core departments." The district court delayed the "interconnectivity assessment for the FACE plan" until an acceptable post-unitary plan for the student-services departments was established that defined their "roles and responsibilities."

In August 2019, the District filed further revised operation plans for AASSD and MASSD. The Students objected to these plans. On December 2, 2019, the court entered an order stating that "[t]he scope of the post-unitary status AASSD and MASSD has been a subject pending too long before this Court, and the delay regarding these departments' roles and responsibilities is now affecting review of other core USP department plans." The district court ordered the special master to file its report and recommendation "regarding the post-unitary AASSD and MASSD" plan by December 6, 2019. Regarding interconnectivity, the district court stated that it "accept[ed]

the overall structure for the FACE Department's administration of FACE services" for "school-based activities" and "central district activities." But the District had not provided a complete list of the "other departments" involved in providing FACE services, and the district court directed that the "FACE Plan shall be revised to *expressly identify* each USP Plan being relied on by the District for the purpose of identifying primary FACE activity responsibilities, where the FACE Department plays a supporting role." The district court stated it was "willing to rely on those other departments' plans to 'detail the [FACE] activities undertaken by each of those departments,' but *the District must ensure that each of these 'other department' USP Plans do in fact include a FACE section detailing the activities undertaken by that department.*"

After the district court's order, the District filed a revised FACE plan attaching as exhibits the relevant portions of the plans governing other departments that provide FACE services and sought unitary status as to § VII. The class representing Latino students objected to the revised FACE plan, arguing that it was premature because there would be necessary revisions related to the special master's delayed work and also that the revised plan still did not "sufficiently detail the interconnectivity of the District's departments that engage in family engagement activities."

In August 2020, after the special master filed its report and recommendation, the district court addressed in significant detail its concerns regarding the AASSD and MASSD and the Students' related objections. The district court rejected the special master's recommendation that the District eliminate or restructure the AASSD and MASSD, and instead "defer[red] to the District's experience." The district court also approved the AASSD and MASSD

operating plans, as clarified by the August 2019 revisions, and found that the revised operating plans "addressed the Court's inquiry as to whether there was duplication of services." The district court also ordered the District to make some clean-up changes to its plans and to address some further issues in future reports and updated plans. Regarding the Students' objections to the operation plans, the district court stated that they should have been asserted against the original plans, not the revised plans, because "the record is clearer now than it was then as to the roles and responsibilities [of AASSD and MASSD]."

In 2021, the district court granted full unitary status for § VII. The Students challenge this finding, arguing that the district court left the issue of interconnectivity—which it had previously highlighted—unresolved. As detailed above, this is incorrect. The district court addressed the interconnectivity issue in detail in August 2020. While that order was not limited to addressing interconnectivity as relates to FACE, it specifically discussed the District's Revised FACE plan filed at the court's direction in December 2019, finding that the revisions "help[ed] to clear up the confusion created by omissions in the [AASSD and MASSD] operating plans" and directing that the "FACE Plan must track the directives in this Order and MASSD and AASSD plan updates."

The Students are correct that the district court did not reference its August 2020 order addressing interconnectivity in the paragraph of its final order that found unitary status as to § VII. But we reject any suggestion that the district court's ultimate conclusion on § VII was based only on its prior orders explicitly referenced in the final order finding unitary status. To conclude otherwise would be to prioritize form over substance. The procedural history here is complicated

and extensive, and the district court's August 2020 order has effect as to all the issues that it addressed whether or not the district court explicitly referenced that order when again addressing the topics that it covered at a later time. There is no indication that the district court vacated or otherwise displaced its August 2020 order. Thus, we conclude that the district court did not err in its findings related to § VII.

### 7. Transparency and Accountability (USP § X)

Section X of the USP focuses on accountability and transparency and establishes an evidence-based accountability system (EBAS) and budget requirements. The Students dispute whether the District complied with Section X in good faith, but they do not argue that § X raises any issues related to vestiges of discrimination.

#### a. EBAS

The EBAS was established "to review program effectiveness and ensure that, to the extent practicable, program changes address racial segregation and improv[e] the academic performance and quality of education for African American and Latino students." The following requirements imposed on the District related to the EBAS:

1) Establish the EBAS.

2) Ensure the EBAS could "(a) track individual student demographic, academic, and behavioral data . . . ; (b) be compatible with and run reports concurrently with the District's data system(s) for tracking personnel data and information; and (c) automatically produce alerts, flags, and other programmed signals to indicate when

students do not meet pre-determined goals or expectations for academic performance or behavioral concerns."

3) Train "all administrators, certificated staff, and where appropriate, paraprofessionals" on the EBAS and evaluate "relevant personnel on their ability to utilize the EBAS."

4) Include information in the District's Annual Report about the employees hired to "fulfill the requirements" related to the EBAS, the changes made to meet the EBAS requirement, and any changes expected in the following year.

In sum, the District was required to develop a mechanism to evaluate USP programs by both establishing a system to gather the required data and then actually gather the data.

In its 2018 order, the district court found that the District had not yet complied with its EBAS requirements. The district court agreed with the special master that the District did "a very good job on the development of EBAS." But, over the District's objection, it found that the "development and implementation" of EBAS was not enough. The district court held that under the USP, "EBAS must be used effectively," and the District had not made that showing. The district court concluded that "the only remaining impediment to unitary status" as related to the EBAS requirement "is to establish that [EBAS] is being used."

After further action by the District, in 2021 the district court found, based on the District's annual reports, that "EBAS is being effectively used," and the district court granted unitary status as to § X.A of the USP. The district

court rejected the Students' "argument that the District must demonstrate . . . it is effectively using EBAS data" to implement USP strategies because "EBAS is designed to gather data necessary to assess program effectiveness, therefore, the question is simply whether EBAS is being used."

On appeal, the Students contend that simply using the EBAS "is not enough to demonstrate that [the District] achieved unitary status in terms of accountability when the purpose of EBAS is to assess program effectiveness." That is, the Students are challenging the district court's interpretation of the EBAS requirement itself, not its factual findings. The district court's interpretation of the USP, a consent decree, is subject to de novo review. *S.F. NAACP v. S.F. Unified Sch. Dist.*, 896 F.2d 412, 413 (9th Cir. 1990). We agree with the district court. Although the USP mandates that the District develop and implement the EBAS, which must be able "to review program effectiveness" as relates to "address[ing] racial segregation and improving academic performance and quality of education for African American and Latino students," it does not mandate *how* the EBAS must be used or otherwise establish a standard for what qualifies as an "effective" use of this system. Thus, the district court did not err in concluding that this component of the USP was narrow: ensuring the District had a robust data collection mechanism that could measure program effectiveness.

### b. Budget

Section X.B required the District to prepare a budget that accounted for the necessary costs incurred in complying with the USP, and, specifically, that allocated the District's funding received under A.R.S. § 15-910(G)—funds

provided "for expenses of complying with or continuing to implement activities that were required or permitted by a court order of desegregation." Additionally, the District was required to "disclos[e] how all funds to be expended to implement [the USP], regardless of funding source, flow to specific components of the [the USP]." The District was also required to consult with both the Students and the special master in establishing its budget and provide them an audit report at the end of the budget year.

In October 2021, the district court declined to grant unitary status related to these requirements until the District revised the Post Unitary Status Reporting Plan "for clarity, especially regarding [A.R.S. § 15-]910G budget process and program changes, including termination." The district court found that these changes were necessary for the public to understand and review the 910(G) budget and programs and provide the appropriate oversight after the District achieved unitary status. In the district court's view, "the budget process has been problematic through the duration of this Court's oversight, with resolution of budget issues complicated because of the time pressures involved in approving the annual budgets." The district court also noted several "examples [that] reflect transparency and accountability issues which will only become more difficult when [the Students] are replaced by members of the public, who will have less understanding of USP programs and the history of their development."

After a second round of revisions in 2022, the district court approved the Post Unitary Status Reporting and Accountability Plan, including its budget provisions. It found that the District's revisions "were not expressly required under any substantive provision of the USP § X" but were critical to unitary status "because they ensure that

to the extent practicable the P[ost Unitary Status Reporting and Accountability Plan] serves to direct the public to the various sources and resources they may need to review, assess, and comment on the District's operations going forward post-unitary status."

On appeal, the Students broadly assert that "[t]he status of the budgetary process . . . does not demonstrate that [the District] achieved unitary status in the area of accountability and transparency." They argue that in directing revisions to the Post Unitary Status Reporting and Accountability Plan in 2021, the district court inappropriately "deferred the resolution of potential budgetary issues . . . to an analysis that would be examined" after unitary status was granted. At bottom, they contend that "the District Court's final judgment[] and unitary status for USP § X" were unwarranted because "keeping [the District] accountable for the improvement of Latino and Black students' education without court jurisdiction and the involvement of Plaintiffs will be difficult."

We reject this argument, which is untethered from the unitary-status standard. The Students do not claim that the alleged unresolved budget issues are a vestige of discrimination or that they show that the District failed to comply in good faith with the USP. Without referencing one of these metrics, the Students cannot show that the district court's grant of unitary status as to § X is erroneous. *Jenkins*, 515 U.S. at 89. Additionally, the district court's orders directing revision of the Post Unitary Status Reporting and Accountability Plan do not undermine its finding of good faith because the District complied with the court's directives.

### 8. COVID-19 Data

Finally, the Students contend that "because of the Covid-19 pandemic, any available statistical information would be outdated, skewed and inappropriate to determine whether [the District] has eliminated the vestiges of past discrimination." They do not cite any evidence to support this contention, and it is not self-evident that the district court erred in its consideration of the evidence. The district court based its factual findings on extensive evidence, including annual reports, mandated notices of compliance and other filings, and data showing participation and outcomes.

In sum, as ongoing racial disparities become more remote in time from *de jure* segregation, "the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish." *Freeman*, 503 U.S. at 491. Here, the seven decades that have passed since there was legally mandated segregation must be given some weight. Unitary status does not depend on the District eliminating all racial disparities. Rather, the law requires that school districts under a desegregation order eliminate *to the extent practicable* racial disparities with a causal connection to past *de jure* discrimination. *Freeman*, 503 U.S. at 496. The record here supports the district court's finding that this standard has been met. *See Fisher*, 652 F.3d at 1136.

### C. Good Faith

In addition to their USP-specific claims, the Students raise several arguments challenging the district court's finding that the District demonstrated good-faith compliance with the USP. None of these arguments are persuasive.

First, the Students focus on the district court's various orders directing the District to revise its plans, implement changes, file notices of compliance, and other similar actions. They assert that these actions by the district court amounted to "admonish[ing] [the District] for its repeated failures to address educational shortcomings, as well as disobeying [the district court's] orders." These "compliance problems," according to the Students, "demonstrate [the District]'s failure to comply with [the court's] orders."

The record does not support the Students' interpretation of the arc of the proceedings following our prior remand. Instead, it reveals an overall pattern of compliance by the District. The district court explained that "[t]he District's course of action reflects more than a mere promise" because it "has now done the things previously found lacking that once precluded a finding of good faith." This should bolster the finding of good faith, not undermine it. *Cf. Freeman*, 503 U.S. at 499 ("With respect to those areas where compliance had not been achieved, the District Court did not find that [the District] had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect. This, though, may not be the equivalent of a finding that the school district has an affirmative commitment to comply in good faith with the entirety of a desegregation plan . . . ."). And as we explained in 2011, "district courts possess ample discretion to fashion equitable relief in school desegregation cases, to tailor that relief as progress is made, and to cede full control to local authorities at the earliest appropriate time." *Fisher*, 652 F.3d at 1142. The district court's involvement in working towards unitary status is a necessary part of supervision, not an indicator of bad faith by the supervisee.

Second, the Students argue that the district court's "finding of partial unitary status is inappropriate and against the purpose of judicial supervision" because the District "failed to demonstrate the requisite commitment to the whole of the USP." This position is squarely foreclosed by *Freeman*'s holding that district courts may grant unitary status in part as supervised parties come into compliance with the requirements of the governing desegregation decree. 503 U.S. at 471.

Third, the Students contend that the District did not operate in unitary status for a sufficient period to justify termination of federal supervision. Citing authority from the Fifth Circuit, the Students assert that the minimum period of unitary-status operation is three years. This brightline rule is not supported by our precedent or the decisions of the Supreme Court, and we decline to adopt it. The Supreme Court emphasized the need to "[d]issolv[e] a desegregation decree after the local authorities have operated in compliance with it *for a reasonable period of time*." *Dowell*, 498 U.S. at 248 (emphasis added). This standard rightly gives district courts the flexibility to determine what is a reasonable period based on the circumstances of the case.

Three years may be appropriate in some circumstances, but the Students do not offer any reasons for why this length of time is necessary here. The district court found that in the six years since the USP was established, "the District has acted in good faith to comply . . . , which is a reasonable period of time to establish a lasting commitment to the USP and the Constitution." The district court further explained that it was "confident that the District will continue USP operations, especially those that are already moving the needle in the right direction. There is no reason to believe that the District will walk away now from this massive six-

year undertaking." This finding was not merely performative given the district court's level of supervision and its knowledge that the District had not always been committed to making the necessary changes.

Fourth, the Students contend that the District "has not met its good faith obligations because it does not track or monitor the effectiveness of its programs." The Students cite our prior decision, which emphasized that the District did not produce any "evidence to rebut the lower court's finding that the District failed to collect and analyze the data that would reveal whether its desegregation efforts were working." *Fisher*, 652 F.3d at 1143. Taken in context, our decision does not support the argument the Students advance.

The problem that we identified in the prior appeal was that the District was "incapable of making logical or meaningful changes to its . . . policies, practices, or procedures related to desegregation," and, as such, "any progress would have been mere coincidence." *Id.* (internal quotation marks omitted). That is no longer true. The District has demonstrated that it is capable of making meaningful changes to its policies, practices, and procedures related to desegregation by complying with the wide-ranging requirements imposed by the USP and with the district court's supplemental orders, notices, and the like. And as previously discussed, the USP did not impose a specific metric or strategy for tracking effectiveness—it simply required the District to establish a data tracking system and to use it. The District has satisfied these requirements, which makes the facts presented here materially different from the last appeal.

Finally, the Students assert that the District's briefing demonstrates that it is hostile to the USP, which shows a lack

of good faith. We do not give any weight to this contention. The advocacy statements that the Students reference do not shed light on the validity of the district court's good-faith finding.

## III.     CONCLUSION

Over decades of federal supervision, the District has not always embraced its obligation to remedy the effects of its past *de jure* segregation. But, considering the extensive record now before us, we conclude the district court properly found that the District has complied in good faith with the requirements of the USP and has eliminated the vestiges of its past discrimination to the extent practicable. Thus, the district court's finding that the District has achieved unitary status and federal supervision is no longer warranted is

**AFFIRMED.**